J & J SNACK FOODS,
CORP, Plaintiff,

v.

NESTLE USA, INC., Defendant.

J & J Snack Foods, Corp., Plaintiff,

v.

**The Earthgrains Co., et al., Defendants.**

Nos. CIV. A. 00–3081JBS,
CIV. A. 00–6230JBS.

United States District Court,
D. New Jersey.

June 27, 2001.

Carlo Scaramella, Cureton Caplan Hunt Scaramella & Clark, PC Delran, NJ, and J. Rodman Steele, Jr., Akerman & Senterfitt, West Palm Beach, FL, for Plaintiff.

Kelly A. Clement, Colin Foley, Howrey Simon Arnold & White, LLP Washington, DC, and Richard D. Catenacci, Connell Foley LLP, Roseland, NJ, for Defendant Nestle USA, Inc.

Donald A. Robinson, Robinson & Livelli, Newark, NJ, and Richard Lehv, Jessica Mann, Fross, Zelnick, Lehrman & Zissu, P.C., New York City, Of-Counsel for Defendant The Earthgrains Co.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

SIMANDLE, District Judge:

TABLE OF CONTENTS

I. *INTRODUCTION* ....................................................140

II. *PROCEDURAL BACKGROUND* ........................................140

III. *FINDINGS OF FACT*..............................................140
 A. *Plaintiff J & J*............................................140
 B. *Defendant Nestle* ........................................141
 C. *Defendant Earthgrains* ...................................142

IV. *CONCLUSIONS OF LAW* ...........................................143
 A. *Preliminary Injunction Standard* ........................143
 1) *Likelihood of Success on the Merits* ...................143
 a.) *Federal Claims under the Lanham Act*...............144
 i.) *Validity and Protectability of Mark* ...........144
 (1) *Whether the Mark is "Generic"* .............145
 (2) *Whether the Mark is "Suggestive" or "Descriptive"* ..........147
 (3) *Secondary Meaning of Descriptive Mark* ...................151
 ii.) *Likelihood of Confusion* ........................154
 iii.) *Defendants' Fair Use Defense*....................157
 b.) *Remaining Claims* ...............................157
 2) *Irreparable Harm to Plaintiff without Injunction* ..........157

3) *Balancing Equities—Potential Harm to Defendants* ....................... 158
4) *Prevailing Public Interest* .......................................... 159

V. *CONCLUSION* ................................................. 159

## I. INTRODUCTION

This Court is called upon to decide whether a preliminary injunction should issue upon the allegations of plaintiff J & J Snack Foods Corporation ("J & J") that defendants The Earthgrains Company ("Earthgrains") and Nestle USA, Inc. ("Nestle") should be enjoined from using the "BREAK & BAKE" mark, which was first registered by Schwan's Sales Enterprises, Inc. ("Schwan") in 1996, and later obtained by J & J in 1999, on their refrigerated cookie dough products. Defendant Earthgrains uses the phrase "Break 'N Bake" in connection with its refrigerated cookie dough product, and defendant Nestle uses the phrase "Just Break— & Bake" in connection with its Nestle's Toll House refrigerated cookie dough product.

There is no dispute that J & J owns the "BREAK & BAKE" mark. Therefore, the primary issues to be decided in this matter are: 1) whether plaintiff is likely to succeed in proving the trademark "BREAK & BAKE" is valid and protectable, which requires this Court to consider whether it is probable that the mark is suggestive or descriptive with secondary meaning and 2) whether plaintiff is likely to successfully show that the use of the mark by either defendant is confusing to consumers. The Court has considered the lengthy submissions of all parties, including detailed affidavits, attachments consisting of documents and depositions, several expert reports, as well as the oral arguments held on June 18, 2001.

## II. PROCEDURAL BACKGROUND

Plaintiff J & J first filed a complaint against defendant Nestle on June 23, 2000, charging Nestle with trademark infringement and unfair competition in violation of federal, state, and common law. On July 12, 2000, the Complaint against Nestle was amended to include John Does I–X. Then, on December 26, 2000, plaintiff filed another action against defendant Earthgrains, charging Earthgrains with identical trademark infringement and unfair competition claims and requesting a preliminary injunction. On February 16, 2001, almost eight months after filing their original complaint against Nestle, J & J made a motion for a preliminary injunction against Nestle, seeking to enjoin its use of plaintiff's "BREAK & BAKE" mark. On March 21, 2001, this Court granted plaintiff's motion to consolidate the two proceedings for all purposes under civil action number 00–3081(JBS).

Now before this Court are plaintiff's motions for preliminary injunctive relief against defendants Earthgrains and Nestle. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338, and under the Lanham Act 15 U.S.C. § 1051 *et seq.* Having read the parties' submissions, and having heard extensive argument on the motions at oral argument on June 18, 2001, this Court will now make factual findings and conclusions of law as required by Rule 65, Fed.R.Civ.P.

## III. FINDINGS OF FACT

The facts of these consolidated cases are, for the most part, undisputed.[1]

### A. Plaintiff J & J

Plaintiff J & J, a New Jersey Corporation, has been in operation for twenty-nine

---

**1.** Unless otherwise indicated, the citations to Pl.'s Br. refer to the brief filed against Nestle.

years, producing food and beverage products. (Pl.'s Br. at 2.) On January 16, 1996, the United States Patent and Trademark Office ("PTO") granted trademark registration to Schwan for the "BREAK & BAKE" mark for use on frozen cookie dough. (*Id.*, Ex. B.) On February 4, 1999, J & J acquired Camden Creek Bakery from Schwan, and also received an assignment of the trademark rights to the "BREAK & BAKE" mark. (*Id.*)

J & J, through its food service division Camden Creek, has sold frozen cookie dough with the "BREAK & BAKE" mark (*see* Pl.'s Br., Exs. D & E) to distributors who offer the products to fund raising organizations. (Pl.'s Br. 3.) The mark "BREAK & BAKE" is featured below the brand name, Camden Creek Bakery. (*See* Exs. D & E.) Plaintiff has not offered evidence of any specific advertising of the products containing the mark, and all of their sales are through fundraisers. (Nestle Opp. at 8–9.) Plaintiff's Camden Creek product is sold only to commercial distributors in the food service industry, and the ultimate consumer would not know the product because it has not been advertised to consumers, according to J & J's Vice President of Marketing, Michael Karaban. (*See* Valenti Decl., Ex. C, Tr. 55–11 to 56–18. ) To date, plaintiff's total sales using the mark range from $1 million (Pl.'s Br. at 3) to $2 million (Pl.'s Reply Br. at 11). It is the business practice of plaintiff to guard its trademarks and plaintiff claims that it has been considering breaking into the retail supermarket refrigerated cookie dough market. (Pl.'s Br. at 3.)

In August, 1999, Nestle began selling its pre-sectioned NESTLE TOLL HOUSE cookie dough bar product. (Nestle's Opp., Ex. Q at 41–42.) Plaintiff claims that in March, 2000, defendant Nestle, through a

third-party, Kelly Pioneer Group, Inc., attempted to purchase the right to use the "BREAK & BAKE" mark. (Pl.'s Br. at 4.) J & J refused to sell the right to use the "BREAK & BAKE" mark. (*Id.* at 5.) In August, 2000, defendant Earthgrains began selling a break and bake style refrigerated dough, labeled as "Break 'N Bake Style Cookies," which was sold under their own trademarked name, "MERICO," as well as other private supermarket labels. (*See* Earthgrains Opp. at 4–5 and 7, Ex. 19; Valenti Decl., Ex. E.) The labels on such products are "Break 'N Bake Style Cookies."

In early April, 2000, plaintiff discovered that Nestle was using the words "break and bake" in conjunction with their line of refrigerated chocolate chip cookie dough. (*Id.* at 4.) Through discovery, plaintiff learned that Nestle had been considering use of the words "break & bake," despite knowledge of the mark's prior registration and an alleged attempt to obtain the right to use the mark, as early as September, 1998. (*Id.* at 4; Confidential Document Packet, Ex. 1.) On April 14, 2000, J & J's counsel sent a cease and desist letter to Nestle, demanding that they stop using the "BREAK & BAKE" mark. (*Id.* at 6, Ex. K.) Plaintiff asserts that Nestle did not discontinue use of the words "break and bake" on its packaging.

**B.** *Defendant Nestle*

One of defendant Nestle's most successful and well known product brands is NESTLE TOLL HOUSE, which is sold in yellow packaging under the Nestle name and TOLL HOUSE logo. (Nestle Opp. at 3.) Nestle has sold refrigerated cookie dough for the last four years, primarily in the familiar "chub" wrapper,[2] and that

---

**2.** The chub is a plastic cylinder containing a "roll" of soft, pre-made dough, which is used

by almost all pre-made cookie dough producers.

product accounts for 19% of all Toll House retail sales. (*Id.* at 3.) The chub requires the use of a knife and/or spoon in order to measure out the proper amount of dough required for each cookie. This style of cookie dough is also commonly referred to as "slice and bake." (Earthgrains Opp. at 2.) To date, there is no trademark for the commonly used phrase "slice & bake."

Nestle indicates that, in response to customer concerns about mess and the necessity for a knife, they expanded their Toll House brand to include pre-made cookie dough, similar to the dough in the chub, but packaged instead in rectangular bar form and scored for easy separation and baking. (*Id.* at 4.) In August, 1999, Nestle began selling the pre-sectioned refrigerated cookie dough under the Toll House name in retail stores. (*Id.* at 4–5; Ex Q at 41–42.) Sometime thereafter, after conducting consumer research, Nestle added the words, "Just Break & Bake!" under an illustration of a dough piece being broken off and baked on a cookie sheet. (*Id.* at 5; Ex. C.)

Nestle actively began to advertise and promote the new pre-sectioned refrigerated cookie dough using television, print and coupons. (Nestle Opp. at 6–7.) A national television commercial produced by Nestle features a song set to the tune of "Shake Your Bootie" which urges consumers: "Lets bake … break, break, break … break and bake, bake your cookies, …, break and bake, Toll House Cookies." (Nestle Opp., Ex. J; Pl.'s Video Exhibit; Earthgrains Opp., Ex 9–B, Video of Nestle's product.) From August, 1999 through the end of 2000, Nestle spent over $20 million promoting, marketing and advertising their Nestle Toll House pre-sectioned refrigerated dough. (Nestle Opp. at 7.)

Plaintiff has not offered any evidence of actual customer confusion, such as a sur-

vey, and instead submitted only the testimony of Kelly Bordini, J & J's Director of Sales for the cookie division, who stated that she received phone calls from consumers, that is the ultimate users who baked and consumed the J & J Camden Creek Bakery product, who expressed confusion about whether the "BREAK & BAKE" cookies were made by J & J or Nestle. (Nestle's Opp., Ex. V, Tr. 44–55.) Ms. Bordini could not recall the names of such consumers or approximately how many had called her and expressed confusion and she did not keep any notes of such calls. (Nestle's Opp., Ex. V, Tr. 45–50.) Ms. Bordini admitted that she had not received any calls expressing confusion from J & J's food service customers. (*Id.* at Tr. 55–56.)

## C. *Defendant Earthgrains*

Earthgrains is a private label manufacturer that sells to customers, generally grocery stores, who in turn sell products to customers in their own stores. The majority of Earthgrains consumers use the name "MERICO," a brand name and trademark owned by Earthgrains, while some retail stores use their own brand name. (*See* Valenti Decl., Ex. E.) Earthgrains entered the premade sectioned cookie dough market approximately eleven months after Nestle introduced its "Just Break—and Bake!" products. Earthgrains's packaging appears with the words "Break 'N Bake" prominently featured under the store or private label cookie name, with the word "Style" following in smaller letters. (*See* Valenti Decl., Ex. E, Exemplars of various Earthgrains packages). Earthgrains's product, like Nestle's, is a rectangular bar of cookie dough, approximately five inches long, four inches wide, and one inch thick, that is partially scored both horizontally and vertically so that the bar is divided into twen-

ty one-inch cubes. Both Nestle's and Earthgrains's dough bars are packaged in a soft bag-like package.

J & J's product is not a bar of dough that is partially scored. Rather, J & J's product is packaged in a box as individual, separate, puck-like[3] round portions of cookie dough that are described as "kissing" or pressed together, which must be kept frozen. Each box contains dough for forty-eight one ounce cookies, which is packaged in two large sheets of twenty-four dough pucks each. (Pl.'s Motion, Ex. E.) Rather than forming a dough bar similar to the Nestle and Earthgrains products, the J & J product is best described as round cookie dough pucks, partially joined together at the edges in a frozen sheet. When the consumer uses J & J's product, they must detach the number of frozen dough pucks they desire and break each puck apart before placing them on a baking sheet in the oven.

## IV. *CONCLUSIONS OF LAW*

The plaintiff has filed motions for preliminary injunctions against Earthgrains and Nestle, to stop each defendant from using words that allegedly infringe plaintiff's "BREAK & BAKE" mark on the packaging and advertising for their refrigerated cookie dough products. Although the actions were commenced separately, due to the similar issues of fact and law and the common plaintiff, they were consolidated for all purposes.

### A. *Preliminary Injunction Standard*

The decision of whether to grant a preliminary injunction is within the discretion of the district court. *United States v. Price*, 688 F.2d 204, 210 (3d Cir.1982). When deciding a motion for a preliminary injunction under Rule 65(a), a district court must consider four factors:

> (1) whether the movant has shown a likelihood of success on the merits; (2) whether the movant will be irreparably injured by denial of relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest.

*Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.,* 212 F.3d 157, 160 (3d Cir.2000), *cert. denied,* 531 U.S. 1071, 121 S.Ct. 760, 148 L.Ed.2d 662 (2001). An injunction, however, is an extraordinary remedy that should only be granted in limited circumstances. *AT & T v. Winback & Conserve Program,* 42 F.3d 1421, 1426–27 (3d Cir.1994). The Third Circuit has held, however, that a district court shall grant such relief in trademark infringement cases when a plaintiff carries its burden on each of the aforementioned factors. *See Opticians Ass'n of Am. v. Independent Opticians of Am.,* 920 F.2d 187, 191 (3d Cir.1990).

### 1) *Likelihood of Success on the Merits*

Plaintiff J & J alleges that both Earthgrains's and Nestle's use of the "BREAK & BAKE" mark constitutes federal trademark infringement and unfair competition under §§ 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1)(a) and 1125(a) (Counts I and II), common law trademark infringement and unfair competition (Counts III and IV), and unfair competition under New Jersey statutory, N.J.S.A. 56:4–1 *et seq.,* and common law (Count V). The parties have focused their briefing on the federal claims under the Lanham Act, 15 U.S.C. § 1051 *et seq.,* and

---

**3.** The Court's use of the word puck to describe plaintiff's product is not in any way meant to be disparaging. It is used only for descriptive purposes.

this Court will evaluate plaintiff's likelihood of success on those counts first.

### a.) *Federal Claims under the Lanham Act*

" 'The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion.' " *Commerce Nat'l Ins. Servs. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 437 (3d Cir.2000)(quoting *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir.1983)). Trademark infringement claims under § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1),[4] and federal unfair competition claims under § 43(a)of the Lanham Act, 15 U.S.C. § 1125(a),[5] are considered using the same standard. *See Advance Magazine Publrs. v. Vogue Int'l*, 123 F.Supp.2d 790, 795 (D.N.J.2000)(citing *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 201–11 (3d Cir.2000)). A claim of trademark infringement or unfair competition is established when the plaintiff proves that: (1) it owns the mark; (2) its mark is valid and legally protectable; and (3) the defendant's use of the mark to identify its goods or services is likely to create confusion concerning the origin of those goods or services. *Commerce*, 214 F.3d at 437; *see Opticians Ass'n of Am. v. Independent Opticians of Am.*, 920 F.2d at 192.

There is no dispute in this case that J & J owns the "BREAK AND BAKE" mark, originally registered by its predecessor Schwan on January 16, 1996. (*See* Nestle's Opp. at 11.)[6] Therefore, the Court will focus its inquiry on whether plaintiff is likely to succeed in showing that the mark is valid and legally protectable and whether the use by each defendant is likely to create confusion.

### i.) *Validity and Protectability of Mark*

If the mark at issue in an infringement case is federally registered and has become incontestable, then validity and protectability are proved as a matter of course. *See Commerce*, 214 F.3d at 438. If, however, a mark is registered, but has not achieved incontestability,[7] then " 'valid-

---

4. Section 32 of the Lanham Act provides, in relevant part:

(1) Any person who shall, without the consent of the registrant, (a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution or advertising of any goods or services on or in connection with which such use is likely to cause confusion, ..., shall be liable in a civil action by the registrant....

5. Section 43 of the Lanham Act, which protects registered and unregistered marks, provides, in relevant part:

(a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities by another person, ..., shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

6. Likewise, plaintiff has made no claim of confusingly similar packaging ("trade dress"), nor that the appearance of defendants' dough products is calculated to create confusion. In appearance, the defendants' products actually appear similar to one another as $5 \times 4$ matrices of one-inch refrigerated cookie dough cubes in colorful plastic wrapping, while plaintiff's cookie dough pucks are round, frozen and marketed in corrugated boxes of monochrome print.

7. A mark becomes incontestable after the owner files affidavits stating that the mark has been registered, that it has been in continuous use for five consecutive years after regis-

ity depends on proof of secondary meaning, unless the unregistered or contestable mark is inherently distinctive.'"[8] *Commerce*, 214 F.3d at 438 (quoting *Ford Motor Co. v. Summit Motor Prods.*, 930 F.2d 277, 292 (3d Cir.1991)). Plaintiff concedes that the "BREAK & BAKE" mark is not incontestable, but notes that it would have achieved such status in January, 2001, had the instant suits not been filed to halt the alleged infringement by defendant. (*See* Pl.'s Br. at 9 n. 3; Pl.'s Mot. Prelim. Inj. Earthgrains at 5 n. 1.)

Trademark law recognizes varying types of marks, typically grouped into four categories: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *A & H Sportswear*, 237 F.3d at 221–22. The "suggestive" and "arbitrary and fanciful" categories are deemed inherently distinctive and therefore valid and legally protectable. *See Fisons Horticulture*, 30 F.3d at 472 (citing *Ford Motor*, 930 F.2d at 291). Plaintiff argues that the "BREAK & BAKE" mark is suggestive or, at a minimum, descriptive with secondary meaning and that it is therefore protectable. Defendants challenge the protectability of the mark, arguing that the mark is generic or, at most, descriptive with no secondary meaning.

### (1) *Whether the Mark is "Generic"*

■ First, the Court will consider whether the mark "BREAK & BAKE" is *generic*, as argued by defendants Nestle and Earthgrains. A mark is "generic" when it is a common descriptive name for a class of products, not connected to any specific brand, and has not been afforded trademark protection. *See Harlem Wiz-*

*ards Entm't Basketball, Inc. v. NBA Prop., Inc.*, 952 F.Supp. 1084, 1092 (D.N.J. 1997). The Third Circuit has discussed what makes an identifier generic:

> When a producer introduces a product that differs from an established product class in a significant, functional characteristic, and uses the common descriptive term of that characteristic as its name, that new product becomes its own genus, and the term denoting the genus becomes generic if there is no commonly used alternative that effectively communicates the same functional information.

*A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 305–06 (3d Cir.1986). In *A.J. Canfield*, the Third Circuit found the term "Chocolate Fudge" used in connection with the name of a diet soda to be generic because the phrase constitutes a "common descriptive explanation of [the] functional difference" between the chocolate fudge soda and plain chocolate soda. 808 F.2d at 308.

■ If plaintiff has a federal registration, then there is a strong presumption that the term is not generic, and a defendant must overcome that presumption. *See* 2 McCarthy, *Trademarks* § 12.12. The "BREAK & BAKE" mark was registered in the principal register in January, 1996, (*see* Pl.'s Mot. Prelim. Inj. Nestle, Ex. B), and is therefore entitled to a presumption that the mark is not generic. "Registration of a mark on the Principal Register provides 'prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the regis-

tration, that no pending proceeding contests the owner's rights to registration, and that there has been no adverse decision concerning the owner's right to registration. *See Commerce*, 214 F.3d at 438 n. 4 (citing 15 U.S.C. §§ 1058, 1065 and *Fisons Horticulture*

*v. Vigoro Indus.*, 30 F.3d 466, 472 n. 7 (3d Cir.1994)).

8. A mark is inherently distinctive if it may be fairly characterized as arbitrary, fanciful, or suggestive. *See Commerce*, 214 F.3d at 438 n. 5 (citing *Ford*, 930 F.2d at 292 n. 18).

trant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate' of registration." *Novartis Consumer Health, Inc. v. McNeil–PPC, Inc.,* 53 U.S.P.Q.2d (BNA) 1406, 1409 (D.N.J.1999)(quoting 15 U.S.C. § 1057(b)).

■ Defendant Nestle, however, cites *Novartis* in support of its argument that "BREAK & BAKE" is a generic mark. (*See* Nestle Op. at 14.) In *Novartis,* Judge Walls found the mark "softchews," when used to describe a new type of soft and chewable medication tablet, to be generic because "none of the commonly used marks effectively communicates the functional information that a tablet is soft and chewable." *Id.* at 1413. In *Novartis,* however, the mark "softchews" was registered on the secondary, not the principal, register. Because there are other alternative ways to describe the product at issue here, even though they are not the best way, and considering the inherently descriptive nature and use of the mark by all parties, the mark does not appear to be generic. However, defendant Earthgrains points out that a third-party, namely Kellog's, has used "break & bake" (*see* Earthgrains Ex. 18) in connection with a recipe book since the 1980s as a means of classifying a group of baking products. (Earthgrains Opp. at 6–7.) This weighs in favor of a generic classification, because it is used to describe a new type of product, used by more than one producer. This type of refrigerated cookie dough product, scored to eliminate the need for a knife and therefore separated by breaking apart, is a new group of products.

Plaintiff's packaging in this case (*see* Earthgrains Opp., Ex. 13) reads, "Break apart cookie dough and bake for delicious cookies." This is a common descriptive name detailing what the consumer will be required to do with the frozen dough prod-

uct, and further indicates that the product comes in "[e]asy to break, easy to bake, layer-packet sheets." (*Id.*) That break and bake states a functional characteristic is also shown by Pillsbury's later entry into this competitive market, claiming yet another advantage over "slice and bake" and "break and bake" cookies with a new product that you just "place and bake." (Earthgrains Opp., Ex. 10.) Pillsbury's use of "break and bake" in its advertising thus describes a type of cookie dough product bearing the generic characteristics of a sheet of pre-made dough which must be broken apart into single cookie units before it can be baked, which would encompass the products the products of plaintiff and defendants at issue here, while Pillsbury's new type ("place and bake") requires no separation of the cookie units before baking, suggestive of a new genus of dough products. Also, plaintiff's president Gerald Schreiber admitted that the mark "tells you really how to prepare this cookie." (Valenti Decl., Ex. C, Tr. 143:10–15). Thus, a mark is generic if it is in the class of "terms [which] so directly signify the nature of the product that interests in competition demand that other producers be able to use them."

Based on the record presented thus far, this Court finds that defendants have not produced sufficient evidence showing that the "BREAK & BAKE" mark is generic, although the issue is admittedly close. Although defendants argue that "break and bake" demonstrates a logical progression from the generic phrase "slice and bake," I find that insufficient evidence of generic use has been presented. Defendant Earthgrains offered the results of an Internet search as proof of the generic nature of the mark at issue. This information, however, without more such as trade press or national sales report references, is insufficient. Furthermore, Pillsbury's promotion

of a "place and bake" product supports defendant's assertion of the genericness of the phrase "break and bake," but evidence of the Pillsbury usage and the Kelloggs recipe book usage (described above) of the "break and bake" phrase as a generic category is probably insufficient, at present, to establish the "break and bake" is merely generic.

## (2) Whether the Mark is "Suggestive" or "Descriptive"

▆▆ Next, the Court will consider whether the mark "BREAK & BAKE" is *suggestive,* as argued by plaintiff, or *descriptive.* A mark, if found to be suggestive, is protectable even without proof of a secondary meaning. 2 McCarthy, *Trademarks* § 11:62 (citing cases). Generally, suggestive marks require consumer "imagination, thought, or perception" to determine what the product is. *See A & H Sportswear,* 237 F.3d at 222. In comparison, descriptive marks describe the purpose, function or use of the product, a desirable characteristic of the product, or the nature of the product. *See* 2 McCarthy, *Trademarks* § 11:16 (citing cases). The descriptive-suggestive boundary line, however, is hardly clear. *See* 2 McCarthy, *Trademarks* § 11:66.

▆▆ The factors to be considered in determining whether a mark is suggestive or merely descriptive, as stated in *FM 103.1, Inc. v. Universal Broadcasting,* 929 F.Supp. 187 (D.N.J.1996), include the following, as applied to this case:

(1) the level of imagination, thought or perception required to reach a conclusion as to the nature of the goods; here, there is essentially no imagination, thought or perception required, and thus, no suggestiveness to the mark "BREAK & BAKE."

(2) the likelihood that competitors will need to use the term in connection with their goods; here, there is no better description for what the consumer does with this cookie dough of plaintiffs and of competitors than to break the dough sections off of the pre-scored cookie dough bar and bake them in the oven; this is indicative of descriptiveness; Pillsbury's use of "place and bake" is not material because it describes what is done with Pillsbury's new product consisting of individual preformed non-touching refrigerated cookie dough.

(3) the extent to which other sellers have used the mark on similar merchandise—frequent use will indicate descriptiveness; here, the evidence shows that three competitors (plaintiff J & J and defendants Nestle and Earthgrains) produce similar products of pre-sectioned cookie dough that must be pulled apart and baked to create cookies. "Break and bake" is the easiest way to convey what must be done to the product, and thus the phrase has been selected and used by competitors to describe their product.

(4) the likelihood that the mark will conjure up other purely arbitrary connotations separate from what the mark conveys about the product; here, no such likelihood exists—unlike the pleasant association with the old nursery rhyme that arose from the use of the mark "Sugar & Spice" in *In re Colonial Stores, Inc.,* 55 C.C.P.A. 1049, 394 F.2d 549 (Cust. & Pat.App.1968).

(5) probability consumers will regard the mark as a symbol of origin or as self-laudatory; here, neither are present.

Points (1), (2), and (4) require further consideration in this case, because these were the points argued by all parties.

First, points (1) and (4) can be considered together because the level of imagination required to "get" the mark is naturally related to whatever arbitrary connotations an imaginative mark might create. For the following reasons, as to points (1) and (4), the Court finds, based on the present record, that little or no imagination, thought or perception is required to reach a conclusion as to the nature of the "break and bake" cookie dough, and that there is little likelihood that this mark conjures up arbitrary connotations about this product separate from what "break and bake" plainly conveys about the cookie dough.

J & J argues that their mark requires some imagination to understand that the product eliminates the consumer's need to mix raw ingredients together in order to obtain cookies, and therefore is an easy, more convenient way to bake. (Pl.'s Reply to Nestle Opp. at 9.) Also, plaintiff states that customers must understand that they are not referring to "broken cookies," which would have a negative connotation, and that the phrase is also a double entendre, requiring the consumer connect the word "break" with "taking a break" and then imagining how pleasant it might be to take a break with this new type of "BREAK & BAKE" cookie dough. J & J concludes that, in light of the pleasant, alliterative sound of the phrase, and the suggestion that the product is easy, the "BREAK & BAKE" mark should receive the heightened protection of a suggestive mark.

In support of its position, plaintiff offers the expert report of Laura A. Michaelis, Ph.D., a linguistics scholar. (*See* Michaelis Report.) Dr. Michealis's report is highly academic and concludes that the phrase 'break and bake' is highly unconventional (*id.* at 2) and involves a novel and creative use of the word 'break' to describe a soft dough product. (*Id.* at 3–4). Dr. Michealis also classifies the phrase "break and bake" as an encoding idiom, which she defines as a phrase with a meaning that could not be determined simply by knowing the meanings of the component words. (*Id.* at 4.) Dr. Michealis concludes by opining that the phrase "break and bake" is suggestive and not descriptive because it is witty, unconventional, and requires imagination on the part of the reader. (*Id.* at 4–6.)

Nestle, conversely, asserts that the phrase is purely descriptive, instructing consumers how to use the new product. Earthgrains agrees with Nestle, citing J & J's sell sheet, which describes the process—"Break apart cookie dough and bake for delicious cookies." (Earthgrains Opp., Ex. 14.) Significantly, plaintiff's sell sheet is the only inducement plaintiff gives to potential customers, since plaintiff does not advertise this product in any other fashion. Nestle further argues that the phrase "Just Break— & Bake," particularly when displayed over an illustration of a person breaking off a portion of dough and then a tray of baking cookies (*see* Nestle Ex. C, Color Package Photo), requires no imagination whatsoever, and therefore that it is descriptive rather than suggestive. Nestle challenges the reliability and relevance of the expert report of Dr. Michaelis, citing her failure to consider the proper consumer group, that is purchasers of premade cookie dough, and asserting that the "proper test for descriptiveness of a word," discussed *supra*, "is its meaning to that class of buyers who are prospective purchasers, which may or may not be synonymous with its popular meaning." 2 McCarthy, *Trademarks* § 11:20 at 11–29.

Consideration of point (2) naturally follows using the "competitor's need test."[9]

9. The "competitor's need test" states that the more imagination required on the part of the

*See* 2 McCarthy, *Trademarks* § 11:68. The Court finds, for reasons now discussed, that the defendants, as competitors, have a high degree of need to use the "break and bake" phrase or similar description to identify their products for customers. Plaintiff points to Pillsbury's refrigerated dough product (*See* Prelim. Inj. Ex., P–10), which is called "Ready to Bake" cookie dough, as evidence that defendants did not need to use the phrase "break and bake" to adequately describe their product. This point appears to cut against plaintiff's position. The Pillsbury "Ready to Bake" product differs from that of plaintiff and defendants, and, in fact, is marketed as even easier than the "break and bake" style of cookie making. Because consumers do not have to break, separate, or tear anything with the Pillsbury product, it would not make sense for them to use that word. Pillsbury, in fact, distances itself from the "break" concept, apparently in an effort to gain an edge over defendants in the already competitive refrigerated cookie dough market.

Nestle's marketing research also indicates that "break & bake" is descriptive. As early as September 23, 1998, it appears that Nestle was aware that the "BREAK & BAKE" mark might be registered by Schwan. (*See* Pl.'s Confidential Docs., Ex 1.) On September 30, 1998, Debbie de Cordova of J. Walter Thompson recommended that, if the "breaking process" was successful with consumers, that the new product should be called "Nestle Toll House Cookie Dough" and should have "a flag/banner below it with language like 'just break and bake.'" (*See* Pl.'s Confidential Docs., Ex 2.) On October 13, 1998, Daryl Mummey drafted an inter office communication, which contained his im-

pressions and suggestions about the Passion Focus Group. (*See* Pl.'s Confidential Docs., Ex 3.) Mummey Recommended that the primary concept for the packaging and advertising should focus on the form and process of product. (*Id.* at 2.)

Nestle's "Passion Focus Group Final Report" (*see* Scaramella Decl., Ex. 5, hereinafter "Focus Group Report"), dated November 17, 1998, compiled the data gathered in early October, 1998 during the focus group testing on the "break and bake" idea for cookie dough and emphasized that break and bake was the most well received way to describe the convenience and ease of the new product. Nestle consistently expressed their intent to use the Nestle Toll House brand name to communicate the quality and taste of the product (*see* Pl.'s Confidential Docs., Ex 3 at 2; Focus Group Report at 16, 20) and capitalize on this new improvement in cookie making: first messy mixing, then slicing, and now easy breaking. (*See* Focus Group Report at 20).

Defendant Earthgrains submitted the report of Walter McCullough, President of Monroe Mendelsohn Research, Inc. (*See* Earthgrains Sur–Reply, Ex. 24, Results from Genericness Survey, hereinafter "McCullough Report.") The McCullough report, dated May, 2001, concluded that a substantial majority of the survey respondents expressing an opinion felt that "Break & Bake" was a common name, and Earthgrains offers this as evidence that the mark is, at most, descriptive in nature. (*See* McCullough Survey at 3.) Additionally, the report noted that of the respondents who thought "Break and Bake" was a brand name, 20% thought it belonged to Pillsbury, and 18% thought it belonged to

consumer to "get" the idea behind the mark, the less likely a competitor will need to use it, since presumably there would be other, more effective ways to describe the product at issue.

a nonexistent company called Break & Bake. (*Id.*)

At oral argument on this issue, Nestle presented several visual aides which succinctly presented the relevant cases, discussed at length in their opposition, addressing the suggestive/descriptive dividing line. First, Nestle discussed marks that were recently held to be descriptive and likened these marks to "BREAK & BAKE." In *Black & Decker Corp. v. Dunsford,* 944 F.Supp. 220 (S.D.N.Y.1996), the court held that the name "Snakelight" was descriptive of the product because it "conveys the 'immediate idea' of the 'characteristics' of the product," or that "[t]he light is flexible, and can be bent or twisted to focus its light in any direction." 944 F.Supp. at 225. The court concluded that the word snake was common enough so that when the name was perceived as a whole, the consumer did not need to engage in any multi-step reasoning process to associate the light with the characteristics of a snake. Defendants argue that like Snakelight, "break & bake" cookie dough requires no multi-step reasoning by cookie dough consumers to understand that one merely needs to break off a section of dough and bake it in the oven.

In *In re Serv–A–Portion, Inc.,* 1986 WL 83345, 1 U.S.P.Q.2d (BNA) 1915 (Trademark Tr. & App. Bd.1986), the Trademark Trial and Appeal Board found the mark "Squeeze n' Serve" to be descriptive when used in connection with single serving ketchup packets, because the combination of terms is merely descriptive of the product. Squeeze n' Serve has the same alliterative quality as "break & bake" and similarly uses an abbreviation of the word and to lend a snappy quality to the name. Although both names indicate ease and convenience to their target consumers, no

real reasoning process must be employed to understand the reference in either case. Nestle further referred several other cases at oral argument that found the marks at issue to be descriptive. *See Unisplay S.A. v. American Elec. Sign Co.,* 1993 WL 493857, 28 U.S.P.Q.2d (BNA) 1721 (E.D.Wa.1993)(finding Solar–Glo descriptive when used as a name for signs illuminated by sunlight because no imagination is necessary to connect sun with solar and light with glo); *In re Colonial Ref. & Chem. Co.,* 1977 WL 22557, 196 U.S.P.Q. (BNA) 46 (Trademark Tr. & App. Bd.1977)(finding SureGrip descriptive of a non-slip paint for floors).

Plaintiff relies upon cases in which marks have been held suggestive, and argues that the "BREAK & BAKE" mark is similarly imaginative and requires multi-stage thinking in order to understand the meaning of the mark. In *American Home Prods. Corp. v. Johnson Chem. Co.,* 589 F.2d 103 (2d Cir.1978), the name "ROACH MOTEL" was found to be suggestive due, in part, to the incongruity of the mark, and the fact that a consumer would have to understand that the product was not actually a motel, but a bug trap where roaches would be destroyed. In *In re Colonial Stores, Inc., supra,* the court found that the name "Sugar & Spice" immediately invoked a pleasant association with the nursery rhyme, and was therefore suggestive, even though it was comprised of two ingredients in the product at issue. Plaintiff argues that "BREAK & BAKE" similarly causes consumers to take a mental leap and associate the product with ease of use, no mess, and a relaxing break. The Court has found the weight of the evidence is to the contrary.

At oral argument, plaintiff argued that the "Spray 'N Vac" case is most similar to the instant case and helpful to its position. In *Glamorene Prods. Corp. v. Boyle–Mid-*

*way, Inc.*, the court found the name "Spray 'N Vac" for a carpet cleaner to be suggestive because the name did not specifically describe that the product's main functional feature was that the scrubbing step had been eliminated. 188 U.S.P.Q. (BNA) 145, 161 (S.D.N.Y.1975). This case, however, is distinguishable. The mark "BREAK & BAKE" clearly and completely instructs the consumer how the pre-made dough is to be used. Indeed, plaintiff's own advertising material (the "sell sheet," above) instructs consumers to "break apart cookie dough and bake for delicious cookies." (Pl's Mot., Ex. E.) Additionally, as this Court previously pointed out, 'vac' is not a word, and therefore requires the consumer to first equate vac with vacuum, then realize that the product eliminates another tedious step in the cleaning process. No such process is likely required by "BREAK & BAKE."

After considering the relevant cases discussed above, and considering the five factors of the *FM 103.1* case, *supra*, in light of the facts of this case, this Court finds that it is highly unlikely that plaintiff would be able to prove that its mark is suggestive rather than descriptive. The Court finds no evidence that some significant mental leap or imagination is necessary for a cookie consumer to understand that the phrase "BREAK & BAKE," when used on a package for pre-made cookie dough, means that no mixing is required. Furthermore, although the Court appreciates the alliterative value of the phrase, the Court finds plaintiff's argument about the double meaning of the common word break to be strained and not sufficiently imaginative to conclude that this mark is suggestive. That these two common words contain the "B" and "K" sounds and rhyme is of diminished significance when these same words happen to be the best descriptors of the product itself. "Taking a break" is nowhere suggested as the sense of usage of "break" as applied to plaintiff's product by plaintiff itself. Also, while Dr. Michaelis's report raises some factual issues about the suggestive nature of the phrase "break and bake," which might at some point be relevant to a trier of fact, in light of the facts of record at this stage, the report does not change this finding. Concluding that plaintiff would not likely succeed in proving that the "BREAK & BAKE" mark is suggestive at trial, and also finding that it is unlikely that the mark is purely generic, this Court finds that the mark is best classified as *descriptive*, because it informs the consumer about the functional characteristics of the refrigerated cookie dough, without requiring any significant mental gymnastics.

### (3) *Secondary Meaning of Descriptive Mark*

A descriptive mark that has not achieved incontestability and which is not "inherently distinctive" may only be found to be valid and protectable if there is proof of *secondary meaning*. See *Commerce Nat'l*, 214 F.3d at 438 (citing *Ford Motor*, 930 F.2d at 292). A plaintiff has the burden of proof to establish that the mark had a secondary meaning at the time the defendant or defendants began using the mark. See *Commerce Nat'l*, 214 F.3d at 438 (citing *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3d Cir.1978)); *see also* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 15:4 (4th ed.1997)(hereinafter "Trademarks"). Therefore, the Court will now consider whether plaintiff would be likely to succeed in demonstrating that its use of the "BREAK & BAKE" mark had obtained secondary meaning at the commencement of the alleged infringement by defendants.

Secondary meaning is established when the plaintiff shows that the

mark " 'is interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products or services.' " *Commerce Nat'l*, 214 F.3d at 438 (quoting *Scott Paper Co.*, 589 F.2d at 1228). Generally, secondary meaning is established through extensive advertising by the mark's owner, which creates an association between the mark and the provider of services advertised under the mark in the minds of the target consumers. *Commerce Nat'l*, 214 F.3d at 438 (citing *Scott Paper Co.*, 589 F.2d at 1228). The greater the degree of descriptiveness of the mark, the heavier the evidentiary burden on the plaintiff to establish secondary meaning. *See* 2 McCarthy, *Trademarks* § 15:33 at 15–51 (citing Restatement (Third) of Unfair Competition § 13, cmt. e (1995)).

The Third Circuit recently offered a non-exclusive list of factors to be considered to consider when evaluating the existence of secondary meaning: 1) the extent of sales and advertising that leads to consumer association; 2)length of use; 3) exclusivity of use; 4) the fact of copying; 5) customer surveys; 6) customer testimony; 7) the use of the mark in trade journals; 8) the size of the company; 9) the number of sales; 10) the number of customers; and 11) actual confusion. *Commerce Nat'l*, 214 F.3d at 438 (citing *Ford Motor*, 930 F.2d at 292). Plaintiff, in its moving and reply briefs, addresses only the first factor, and claimed that the combined sales from 1996 to 2000 by plaintiff and their predecessor under the "BREAK & BAKE" mark, were

approximately $ 2 million. Plaintiff offers no other evidence of secondary meaning.

First, plaintiff has submitted no evidence of any advertising campaign or expenditures that would lead to consumer association of the mark with J & J. In fact, J & J's Vice President in charge of marketing, Mr. Karaban, testified that the single sell sheet for the Camden Creek cookies was used for multiple purposes, including marketing the brand. (*See* Scaramella Decl., Ex. 17, Tr. 139:13–18.) Plaintiff has submitted deposition testimony that shows an estimated $2 million in sales over a five year period. (*See id.*, Tr. 140:2–24.) This factor appears to weigh against plaintiff.

Second, the Court considers the length and exclusivity of use together. Plaintiff asserts that they continuously and exclusively used the "BREAK & BAKE" mark from 1994 until it learned of defendants' use of the mark in 2000.[10] Furthermore, although plaintiff asserts in its moving papers that it has continuously used the "BREAK & BAKE" mark since 1994, it has produced no sales figures for the years 1994 and 1995, submitting the first evidence of any sales for 1996, in the amount of only $59,000, suggesting that the 1994 and 1995 sales were even less. (*See* Valenti Decl., Ex. C, Karaban Dep., Tr. 99:16–18.) Defendants do not dispute that plaintiff was the only manufacturer to use the "BREAK & BAKE" mark from 1996 until September, 1999, but contend that such use is not sufficient to establish secondary meaning. The Court agrees that exclusivity and continuity of use, without more, is not enough to establish secondary mean-

---

10. Plaintiff cites to a Fifth Circuit case and argues that its continuous and exclusive use of the mark for five years entitles it to a presumption of secondary meaning. (Pl.'s Br. at 16, citing *Sunbeam Prods., Inc. v. West Bend Co.*, 123 F.3d 246, 254–55 (5th Cir. 1997), *cert. denied*, 523 U.S. 1118, 118 S.Ct. 1795, 140 L.Ed.2d 936 (1998)). The federal circuit, however, has found that such a presumption is only applicable to trademark applications. *See In re Owens–Corning Fiberglas Corp.*, 774 F.2d 1116, 1125 (Fed.Cir.1985).

ing.[11]

Third, there has been some evidence which shows that defendant Earthgrains has copied the mark, but nothing of significance has been shown with respect to Nestle. Viewing the use of the mark on Nestle's and Earthgrains's packaging, the mark is much more prominently displayed on the Earthgrains packages as "Break 'N Bake," whereas Nestle offsets the words from the familiar Toll House logo, and uses them as more of an instruction, "Just Break— & Bake!". Earthgrains adds the less prominent descriptor "Style" to the phrase, suggesting this is not a "Break 'N Bake" brand name. Nestle features its famous marks "NESTLE" and "TOLL HOUSE," again suggesting that the constructive phrase "Just Break— & Bake!" is not a copying effort.

Fourth, only defendant Earthgrains has submitted a consumer survey, conducted by Walter McCullough, President of Monroe Mendelsohn Research, Inc. (*See* Earthgrains Sur Reply, Ex. 24, Results from Genericness Survey, hereinafter "McCullough Report.") The McCullough report, dated May, 2001, concluded that a majority of the survey respondents felt that "Break & Bake" was a common name. (*See* McCullough Survey at 3.) Additionally, the report noted that of the respondents who thought "Break and Bake" was a brand name, 20% thought it belonged to Pillsbury, and 18% thought it belonged to a non-existent company called Break & Bake. (*Id.*) Although plaintiff submitted no affirmative survey in support of their claim

of infringement, they did submit the expert report of John A. Bunge, who critiqued Mr. McCullough's survey. (Scaramella Decl., Ex. 12.) I have considered the expert report of Mr. Bunge and find that it does not change the other findings of fact and conclusions of law discussed in this decision.[12]

Plaintiff, not surprisingly, does not argue the customer survey, customer testimony, and trade journal factors in their moving papers, because there has been no suggestion that any such evidence exists. Although plaintiff retained an expert to refute the findings in the McCullough Report, discussed above, they have yet to conduct any customer survey of their own to provide support of their claim that their mark has secondary meaning, despite ample time, resources and motivation to do so.

Fifth, as discussed earlier, plaintiff submitted testimony that it had $2 million in sales for this product over a five year period. (*See* Scaramella Decl., Ex. 17, Tr.139:13–18.) Plaintiff, by its own admission, is a profitable food product producer that has been in business nearly thirty years and which has obtained a reputation within the food service community. (Pl.'s Br. at 2.) Although it is not as large or well known as Nestle, who has admitted sales (from August, 1999 until the end of 2000) related to this product in the amount of $89 million (*see* Nestle Opp. at 7, Exs. I and P at 121), J & J is a company with total sales in excess of $300 million per year. (*See* Nestle Opp., Ex. W, Schreiber

---

11. This Court is not finding that plaintiff will never be able to show secondary meaning. In fact, to the contrary, plaintiff might be able to offer more significant proof once discovery in the case progresses.

12. The Bunge report criticizes what he perceives to be survey errors (*e.g.*, the rotation of the terms on the survey, the use of well known, clearly established marks, and the use of modifiers with names) and sampling errors (*e.g.*, including only weekend shoppers) in Mr. McCullough's report. This report was considered and Mr. Bunge's opinions do not discredit the fundamental reliability of Mr. McCullough's survey evidence, in this Court's view.

Deposition Tr. 22:20–25.) The pre-made cookie dough sales make up only a small fraction of those total sales. *cf. Black & Decker Corp. v. Dunsford,* 944 F.Supp. 220 (S.D.N.Y.1996)(finding no secondary meaning where evidence of sales volume was scant, in addition to poor evidence of other factors). Finally, there has been no testimony or evidence submitted by plaintiff that any actual confusion among plaintiff's customers exists.

Based upon the submissions and arguments heard thus far, the Court finds that plaintiff is not likely to succeed in demonstrating that the "BREAK & BAKE" mark had achieved secondary meaning at the time the defendants allegedly began the infringing use of the mark. Accordingly, the Court finds that it is not likely that plaintiff's mark, "Break & Bake" is protectable, and thus it is unlikely that plaintiff will prevail on the merits of its infringement claims.

### ii.) *Likelihood of Confusion*

█ Even assuming that the plaintiff had demonstrated that the descriptive mark "BREAK & BAKE" achieved secondary meaning at the time of the alleged infringement by defendants, which it has not yet done, plaintiff would still have to show that there is a likelihood of confusion between the two products in order to prevail upon the claim of infringement. Likelihood of confusion is said to exist " 'when the consumers viewing the defendant's mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.' " *Commerce Nat'l,* 214 F.3d at 438–39 (citing *Ford Motor,* 930 F.2d at 292 (quoting *Scott Paper Co.,* 589 F.2d. at 1229)).

The Third Circuit has consistently analyzed certain factors to consider in determining whether there is a likelihood of confusion between marks, which include, but are not limited to:

(1) the degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of the similarity of function;

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*A & H Sportswear,* 237 F.3d at 211 (citing *Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460, 463 (3d Cir.1983)); *see also Scott Paper Co.,* 589 F.2d at 1229. Throughout the opinion these factors will be referred to as the "Lapp" factors. The Third Circuit has also instructed that the Lapp inquiry is a qualitative one, and that the district court should utilize only the factors it deems appropriate to the case before it. *A & H Sportswear,* 237 F.3d at 215.

J & J argues that the labels convey the "same overall impression when viewed separately," *A & H Sportswear,* 237 F.3d at 216, and therefore are likely to confuse

buyers. (Pl.'s Br. at 19–20.) Application of the above Lapp factors to the facts of this case, however, further supports the conclusion that plaintiff would be unlikely to meet its burden of showing a likelihood of confusion, and that their motion for a preliminary injunction should be denied. Although the words break and bake are used by J & J, Nestle and Earthgrains, the package size and design styles are markedly different. (*Compare* J & J Box, Foley Decl., Ex. 7; Nestle Package, Foley Decl., Ex. 6; and Earthgrains Package, Ex 19.) Earthgrains' use of the mark, discussed *infra*, is more troublesome should a valid mark be proved at trial.

Plaintiff's mark, as discussed above, is not very strong. At best it is descriptive and, if anything, is more strongly associated with Nestle, although J & J owns the mark registration. J & J has presented no evidence of advertising and has sold to only one limited market (*i.e.*, fundraiser distributors). Therefore, it appears unlikely that plaintiff would succeed in showing a likelihood of confusion, if plaintiff ever got to that step in the first place.

Plaintiff also claims that the defendants' use will create reverse confusion. In *Fisons*, the Third Circuit considered a reverse confusion claim and explained, "reverse confusion occurs when a larger, more powerful company uses the trademark of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services." 30 F.3d at 474. The proper inquiry in a reverse confusion claim is whether there is a likelihood of consumer confusion as to the source or sponsorship of the product. *A & H Sportswear*, 237 F.3d at 229 (citing *Fisons*, 30 F.3d at 475). Another "test" surfaced, involving many of the same factors:

(1) the degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the two marks, weighing both a commercially strong junior user's mark and a conceptually strong senior user's mark in the senior user's favor;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors;

(10) other facts suggesting that the consuming public might expect the larger, more powerful company to manufacture both products, or expect the larger company to manufacture a product in the plaintiff's market, or expect that the larger company is likely to expand into the plaintiff's market.

*A & H Sportswear*, 237 F.3d at 229, 234. As with the test for direct confusion, however, no one factor is dispositive, and in individual cases, particular factors may not be probative on the issue of likelihood of confusion. "The weight given to each factor in the overall picture, as well as its weighing for plaintiff or defendant, must

be done on an individual fact-specific basis." *Fisons,* 30 F.3d at 476 n. 11.

There is no issue that Nestle is a much bigger commercial power than J & J. As previously considered, however, plaintiff's "BREAK & BAKE" mark is not likely to be proved valid and protectable and is, at best, very weak. Nestle's usage of the phrase "Just Break— & Bake!" would thus connote an even weaker mark, since it is actually a sentence of exhortation or encouragement. In the same vein, there is only a small degree of similarity between J & J's mark and Nestle's use of the words in their instruction "Just Break— & Bake!" Earthgrains's use of the name "Break N' Bake Style" cookie dough is more similar to plaintiff's mark than Nestle's, but there is still not a great degree of similarity when the marks are compared and the word "style" is noted.

The parties agree that because the price of refrigerated cookie dough is minimal, customers are not likely to use great care and attention when deciding which brand to purchase, which is a factor in plaintiff's favor toward likelihood of confusion.

The fourth *Faison* factor, length of defendants' use of the mark without actual confusion, sharply cuts against plaintiff's claim of reverse confusion. Nestle began selling and marketing its product in September, 1999, approximately twenty-one months ago, and Earthgrains began selling its store brand product in August, 2000, approximately ten months ago, yet plaintiff has produced no evidence that any actual confusion between and among the products has occurred. The fifth factor, the intent of defendants in adopting the mark, also appears to weigh in favor of a finding of no reverse confusion. Nestle appears to use their "Just Break— & Bake" instruction as a descriptor for the consumer, once the product was recognized by the prominent and familiar yellow packaging and "Nes-

tle" and "Toll House" names. Nestle's internal marketing research revealed that "break and bake" was the best way to describe what the product was, and how it differed from or improved upon previous forms of Toll House refrigerated dough. Earthgrains appears to have intended the mark to serve as a generic descriptor, indicative of a popular new "Style" of refrigerated cookie dough, perhaps to evoke Nestle's product, not J & J's, in any event. As previously discussed, plaintiff has produced no evidence of actual confusion in this case.

The seventh and eighth factors can be considered together. Plaintiff has conceded that the products at issue are not marketed through the same channels of trade, nor are they advertised the same; Nestle launched a full-scale retail advertising campaign on television and in print, J & J advertised only through sell sheets and sold only to food distributors, while Earthgrains, as a manufacturer of generic store brands, did no advertising at all. The end consumers of all three products, however, appear to be the same—busy working families who want delicious cookies, the baking of which can be a family activity. This factor alone, however, is insufficient to find reverse confusion, particularly in light of the absence of any actual confusion thus far. The last two factors similarly do not weigh in favor of finding a likelihood of reverse confusion in this case. Cookie consumers are aware that there are several competitors in the refrigerated cookie dough market and are not likely to assume that two varieties of refrigerated dough which require only separation of the pre-scored portions and baking are the same or produced by the same company.

Thus, absent more substantial evidence of reverse confusion, plaintiff is unlikely to succeed on this point either. It is worth

mentioning that Nestle's $20 million advertising campaign might lead potential retail consumers of plaintiff's products to believe that the cookie dough products at issue are similar, but it would not indicate that plaintiff was in any way copying a mark or style created by Nestle. Earthgrains, conversely, has done no advertising of the product, due to the nature of store or house brands. Therefore, because Earthgrains does not aggressively advertise the way Nestle does, the prospect for reverse confusion between Earthgrains and plaintiff J & J is nil.

### iii.) *Defendants' Fair Use Defense*

Both Nestle and Earthgrains have asserted fallback fair use defenses to plaintiff's allegations of trademark infringement and unfair competition in addition to their arguments that the mark is not protectable. In light of this Court's determination that it is unlikely plaintiff will show that "BREAK & BAKE" is a valid and protectable mark at trial, it is not necessary to fully consider these defenses at this time. This defense however, upon the progression of discovery, may be relevant at trial. Presently, upon preliminary consideration, the Court is more impressed with Nestle's fair use defense than Earthgrains's. The parties should carefully consider the risks associated with a trial on the merits. Earthgrains, in particular, might consider changing its packaging style so that the words "BREAK 'N BAKE" are less prominently featured, or so that the word "Style" is of equal prominence, although this Court has no basis to compel Earthgrains to do so at this time.

### b.) *Remaining Claims*

■ The parties agree that the elements required to prevail on the remaining claims, for common law trademark infringement and unfair competition (Counts III and IV) and New Jersey statutory unfair competition (Count V), are identical to those required by federal law under the Lanham Act, discussed *supra*. Therefore, because this Court has found that plaintiff is unlikely to succeed on the merits of its federal claims, it similarly finds that plaintiff will be unlikely to succeed on the remaining state and common law claims for trademark infringement and unfair competition.

### 2) *Irreparable Harm to Plaintiff without Injunction*

■ Plaintiff argues that it will suffer irreparable harm if a preliminary injunction is not issued and if defendants are allowed to continue using the mark "BREAK & BAKE" on their refrigerated cookie dough products. Plaintiff correctly notes that where likelihood of confusion is proved, irreparable injury is presumed. *See Pappan Enters. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 805 (3d Cir.1998). Because this court has determined that plaintiff is unlikely to succeed in showing that it owns a valid and protectable mark, and that there has not been a showing of the likelihood of confusion here, there is no inference of irreparable injury.

Plaintiff offers no other evidence of irreparable injury. Although J & J argues that it is barred or deferred from entering the retail frozen/refrigerated cookie dough market because of Nestle's and Earthgrains's use of break and bake, it has not conducted any surveys, studies or tests to support that assertion. Had plaintiff, for example, conducted a test market roll out of its frozen dough in retail supermarkets and encountered actual difficulty with sales, then perhaps there would be some evidence of irreparable harm. Similarly, had plaintiff conducted a market survey about whether another brand of pre-scored refrigerated cookie dough would be wel-

comed into the already competitive market, or even produced some witness testimony, then there might be some showing of harm.

Additionally, if J & J is at a competitive disadvantage to Nestle, and reluctant to enter the fray at this time, it is more likely due to the prominence of the Nestle and Toll House brands and the success of the Nestle effort to date, rather than due to Nestle's use of the instruction "Just Break— & Bake!" on its refrigerated cookie dough. Moreover, plaintiff's frozen product would presumably be stocked in supermarket freezers if plaintiff entered the supermarket scene, and the consumer would not even see Nestle's refrigerated dough bar product in the same place, which again weakens plaintiff's suggestion that it is irreparably harmed by defendants' actions. Based on the submissions and oral argument thus far, the Court can find no logic in plaintiff's barrier to entry argument, which appears to be a post hoc rationalization for inactivity.

Last, plaintiff's eight month delay in seeking a preliminary injunction against Nestle also undercuts its present claim of irreparable harm. *See Citibank, N.A. v. Citytrust,* 756 F.2d 273, 277 (2d Cir.1985)(finding ten month delay to undercut urgency of request for preliminary injunctive relief). No change in Nestle's use of the words break and bake on its product or in its advertising occurred between the time plaintiff's original complaint was filed and the time the instant preliminary injunctive relief was requested. This delay, particularly in light of the absence of any evidence of irreparable harm, belies plaintiff's request for injunctive relief.

### 3) *Balancing Equities–Potential Harm to Defendants*

In this prong, a court considering issuance of a preliminary injunction must balance the potential hardships that either side will endure as a result. *Opticians Ass'n,* 920 F.2d at 197. In this case, both Nestle and Earthgrains argue that they would suffer tremendous financial harm if the preliminary injunction is granted. Nestle claims that it would suffer harm related to the revision of all packaging, advertising and promotional material, and that it would inhibit the company's ability to promote the functional characteristics of their new refrigerated cookie dough product. (*See* Nestle Opp. at 39–40). Earthgrains similarly argues that they would suffer because they have no alternative packaging materials for their product and would therefore have to cease production until substitute packaging could be procured. (*See* Earthgrains Opp. at 27–28). Earthgrains also expresses concern that customer goodwill will be damaged by such a delay and that the "recall" requested by plaintiff will create a burden even more excessive than the injunction itself. (*Id.*) Earthgrains argues that such an injunctive "recall" would give consumers the impression that the product is somehow tainted which could not be overcome if that defendant eventually prevails on the merits.

Plaintiff asserts that it will be harmed and that Nestle's continued use of the "BREAK & BAKE" mark will cause "the loss of value of J & J's trademark as well as J & J's product identity, corporate identity, control over its good will and reputation and ability to move into new markets." (Pl.'s Br. at 29.) In its moving brief against Earthgrains, plaintiff claims that its use of the mark will damage customer's good will. (Pl's Br. at 17–19.)

In light of the weakness of plaintiff's mark and the descriptive use of the phrase by Nestle, and also considering the virtual lack of advertising on the part of plaintiff and the delay preceding this motion, it

appears that the balancing of the equities favors defendants. Further, in the unlikely event plaintiff prevails on the merits of its infringement claim, plaintiff would be redressed with money damages. Meanwhile, if the defendants were incorrectly preliminarily enjoined now, their ability to be restored would be conjectural and unlikely, given the interruption in sales, loss of good will, destruction of unsold product, and necessity for start-up efforts, all of which may never regain defendants' evident product momentum.

#### 4) *Prevailing Public Interest*

 This prong, in a trademark case, requires considering the right of the consuming public not to be deceived or confused by the infringing use of a mark. *See Opticians Ass'n*, 920 F.2d at 197 (3d Cir. 1990). Because this Court has found that plaintiff is not likely to succeed on the merits, and further that there has been no evidence of likelihood of confusion, there can be no conclusion that the public interest would be served by enjoining defendants' use of this mark at this time.

### V. *CONCLUSION*

In summary, for the reasons discussed herein, plaintiff's motion for preliminary injunction will be denied as to both defendants.

The accompanying Order is entered.

### ORDER

This matter having come before the Court upon the motion of plaintiff J & J Snack Foods Corp. ("J & J") for a preliminary injunction against defendant Nestle USA, Inc. ("Nestle"), and defendant Earthgrains Co. ("Earthgrains"); and the Court having considered the parties' submissions as well as arguments at an oral hearing held on June 18, 2001; and for the reasons expressed in the Findings of Fact and Conclusions of Law of today's date;

**IT IS** this ___ day of June, 2001, hereby

**ORDERED** that plaintiff's motion for preliminary injunctive relief against defendant Nestle be, and hereby is, *DENIED*; and

**IT IS FURTHER ORDERED** that plaintiff's motion for preliminary injunctive relief against defendant Earthgrains be, and hereby is, *DENIED*.