**J & J SNACK FOODS, CORP., Plaintiff,**

v.

**The EARTHGRAINS CO., et al., Defendants.**

**Civil Action No. 00–6230 (JBS).**

United States District Court, D. New Jersey.

Sept. 25, 2002.

---

See also 149 F.Supp.2d 136.

Donald A. Robinson, Esquire, Robinson & Livelli, Newark, NJ, and Richard Lehv, Esquire, Jessica Mann, Esquire, Fross, Zelnick, Lehrman & Zissu, P.C., New York City, for Defendant The Earthgrains Co.

## OPINION

SIMANDLE, District Judge.

In recent years, a category of cookie dough products has emerged in which preformed frozen or refrigerated cookie dough is sold to the consumer in sheet form. The consumer needs only to break the cookie dough apart and bake it in an oven to produce fresh-baked cookies. This break-and-bake characteristic forms the context of this trademark dispute over the "BREAK & BAKE" mark.

This action is before the Court upon the motion of Defendant the Earthgrains Company ("Earthgrains") for summary judgment on the Complaint of Plaintiff J & J Snack Foods, Corp. ("J & J"), pursuant to Rule 56, Fed.R.Civ.P. On June 27, 2001, this Court issued lengthy Findings of Fact and Conclusions of Law and an Opinion and Order denying J & J's request for a preliminary injunction to enjoin Earthgrains and Nestle, USA, Inc. ("Nestle")[1] from using the "BREAK & BAKE" mark, which was first registered by Schwan's Sales Enterprises, Inc. ("Schwan"), and later obtained by J & J in 1999. *J & J Snack Foods Corp. v. Nestle USA, Inc.,* 149 F.Supp.2d 136 (D.N.J.2001). Earthgrains now asserts that summary judgment should be entered in its favor because Plaintiff's only submission after the denial of the preliminary injunction—a survey from Michael Rappeport, Ph.D. on

Timothy D. Pecsenye, Esquire, William C. Mead, Jr., Esquire, Blank Rome Comisky & McCauley LLP, Cherry Hill, NJ, for Plaintiff.

---

**1.** On March 21, 2001, this Court entered an Order that consolidated Plaintiff J & J's cases against Defendant Nestle (Civil Action No. 00–3081) and Defendant Earthgrains (Civil Action No. 00–6230). On January 22, 2002, a stipulation of dismissal with prejudice was filed in *J & J Snack Foods v. Nestle and Earthgrains,* Civ. 00–3081 (consolidated), releasing all claims between Plaintiff J & J and Defendant Nestle. [Docket Item 37–1].

the suggestiveness or descriptiveness of the mark—lacks validity and fails to raise a genuine issue of fact material to the resolution of this case. Plaintiff contends that summary judgment should not be entered because there is a genuine issue of fact as to whether its "BREAK & BAKE" mark is being improperly used by Earthgrains. Plaintiff asserts that the mark is valid and protectable and that there is a strong likelihood of confusion between its mark and the label used by Defendant. For the reasons stated herein, Defendant Earthgrains' motion for summary judgment on Plaintiff's Complaint will be granted and Plaintiff's Complaint against Earthgrains will be dismissed.

## I. PROCEDURAL AND FACTUAL BACKGROUND

The extensive factual background of this case was detailed in this Court's Findings of Fact and Conclusions of law, rendered on June 27, 2001, and will not be repeated at length herein. *See J & J Snack Foods Corp. v. Nestle USA, Inc.,* 149 F.Supp.2d 136, 140–143 (D.N.J.2001)(hereinafter, *J & J Snack I* ).

### A. *The Parties*

Plaintiff J & J, a New Jersey corporation, has been in operation for twenty-nine years, producing food and beverage products. (Def.'s Statement of Facts ¶ 1.) One product is frozen cookie dough which it sells to distributors who offer it to fund raising organizations. (*Id.* ¶ 4.) Defendant Earthgrains is a private label manufacturer that sells bread, baked goods, and refrigerated dough products to customers, generally grocery stores, who in turn sell the products to consumers in their stores. (Pl.'s Statement of Facts ¶ 3; Def.'s Statement of Facts ¶ 27.) The products are sold either under Earthgrains' own trademark, Merico, or under a store brand name. (Def.'s Statement of Facts ¶ 28.)

### B. *The "BREAK & BAKE" Mark*

On January 16, 1996, the United States Patent and Trademark Office ("PTO") granted trademark registration to Schwan for the "BREAK & BAKE" mark for use on frozen cookie dough. (Def.'s Statement of Facts ¶ 2; Pl.'s Br., Ex. B.) On February 4, 1999, J & J acquired Camden Creek Bakery from Schwan, and also received an assignment of the trademark rights to the "BREAK & BAKE" mark. (*Id.*) As a result, J & J, through its food service division, began selling the frozen cookie dough with the "BREAK & BAKE" mark to distributors who, in turn, sell the dough to fund raising organizations. (Def.'s Statement of Facts ¶ 4.) The dough comes as a sheet of twenty-four round disks of frozen cookie dough which must be broken apart and baked. (*Id.* ¶ 5.) The package includes the "BREAK & BAKE" mark below the brand name "Camden Creek Bakery" and instructs consumers to "[b]reak apart cookie dough and bake for delicious cookies." *J & J Snack I,* 149 F.Supp.2d at 146. J & J's president, Gerald Schreiber, testified that the mark thus "tells you really how to prepare the cookie." *Id.* (citing Schreiber Dep., Tr. at 146). J & J does not dispute that its advertising of its "BREAK & BAKE" dough is limited to a one-page "sell sheet" that is supplied to the distributors who sell the products to fund raising organizations. (Def.'s Facts ¶ 15.) J & J's Camden Creek "BREAK & BAKE" cookies are not marketed to the general public.

Earthgrains markets its scored refrigerated cookie under its MERICO trademark name and also under a number of store brand names. (Def.'s Facts ¶ 29.) The phrase "Break 'n Bake Style" appears under the brand name on Defendant's packaging and over the flavor of the cookie. The dough comes as a rectangular sheet that is partially scored horizontally and

vertically to form twenty cubes of dough. *J & J Snack I,* 149 F.Supp.2d at 142. The Earthgrains' "Break 'n Bake Style" frozen cookie dough products are available in many supermarkets across the country and are often sold under the store's generic brand name. (Pl.'s Statement of Facts ¶ 3.) Earthgrains remains one of the largest producers of private label refrigerated dough products in the United States, and was purchased by the Sara Lee Bakery Group, Inc. ("Sara Lee") in the summer of 2001. (*Id.* ¶ 4, 5.)

Several other producers of refrigerated cookie dough, such as Pillsbury and former defendant Nestle, market a product similar to the one at issue, advertising it as "slice and bake," "Break—and Bake," and "place and break." (*See* Groce Decl., Exs. 8–10.)

### C. *Procedural History*

J & J first filed a complaint against Nestle, a former consolidated defendant, on June 23, 2000, charging Nestle with trademark infringement and unfair competition in violation of federal, state, and common law. On December 26, 2000, J & J filed another action against Defendant Earthgrains, charging Earthgrains with identical trademark infringement and unfair competition claims and requesting a preliminary injunction. On February 16, 2001, almost eight months after filing their original complaint against Nestle, J & J made a motion for a preliminary injunction against Nestle, seeking to enjoin its use of the "BREAK & BAKE" mark. On March 21, 2001, this Court granted J & J's motion to consolidate the two proceedings for all purposes under civil action number 00–3081(JBS).

On June 27, 2001, this Court denied J & J's motions for preliminary injunctive relief against Earthgrains and Nestle. On December 20, 2001, an Order was entered that deconsolidated the Nestle and Ear-

thgrains actions and on January 22, 2002, a stipulation of dismissal with prejudice between J & J and Nestle was filed because the parties had resolved their dispute amicably. After completion of pretrial discovery, Defendant Earthgrains filed the instant motion for summary judgment and oral argument was heard. For the reasons stated herein, Earthgrains' motion for summary judgment will be granted and J & J's Complaint will be dismissed as to Defendant Earthgrains.

## II. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. *Id.* Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Id.*

In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "[T]he nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie,* 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) (quoting *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may rea-

sonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. 2505; *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 329–30 (3d Cir.1995) (citation omitted).

The moving party, here Defendant Earthgrains, always bears the initial burden of showing that no genuine issue of material fact exists, regardless of which party ultimately would have the burden of persuasion at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Country Floors v. Partnership of Gepner and Ford,* 930 F.2d 1056, 1061–63 (3d Cir.1991)(reviewing district court's grant of summary judgment in a trademark action); *Lucent Info. Manage. v. Lucent Tech.,* 986 F.Supp. 253, 257 (D.Del.1997)(granting summary judgment in favor of telecommunications provider in trademark action), *aff'd,* 186 F.3d 311 (3d Cir.1999); *Jalil v. Avdel Corp.,* 873 F.2d 701, 706 (3d Cir.1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990). However, where the nonmoving party bears the burden of persuasion at trial, as plaintiff does in the present case, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. 2548. Strict observation of the principles governing summary judgment is particularly important in trademark actions, where grant of summary judgment is an exception to the rule. *See Country Floors,* 930 F.2d at 1062–63.

The non-moving party, here Plaintiff J & J, "may not rest upon the mere allegations or denials of" its pleading in order to show the existence of a genuine issue. Fed.R.Civ.P. 56(e). Plaintiff must do more than rely only "upon bare assertions, conclusory allegations or suspicions." *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.1985), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537,

88 L.Ed.2d 467 (1985) (citation omitted); *see Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505. Thus, if the plaintiff's evidence is a mere scintilla or is "not significantly probative," the court may grant summary judgment. *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505; *Country Floors,* 930 F.2d at 1061–62.

### B. *J & J's Claim Against Earthgrains*

In its initial application, J & J asserted that it was entitled to preliminary restraints because Earthgrains (and at the time Nestle) were improperly using J & J's trademark on the packaging for pre-scored refrigerated cookie dough. *J & J Snack I,* 149 F.Supp.2d at 140. This Court denied J & J's application for preliminary restraints based on the preliminary injunction hearing and record, finding that the mark was, at best, a descriptive mark without secondary meaning. *Id.* at 153–54. The Court declined to classify the mark as generic without more evidence from Defendant. The Court also noted that J & J had submitted no customer surveys or testimony in support of its application. *Id.* at 153.

Defendant Earthgrains now moves for summary judgment on J & J's Complaint, asserting that no genuine issue of material fact remains to be determined, and pointing out that J & J's only new evidence, the survey and research of Michael Rappeport, Ph.D. (1) should not be admissible because of reliability problems, and (2) does not create a genuine issue of material fact in this case in any event. Neither party challenges the law applied by this Court on the application for preliminary restraints in *J & J Snack I. See* 149 F.Supp.2d at 143–59; Tr. 5/2/02 at 42:5–19. The issue is whether the evidence presently before the Court on summary judgment—namely, (1) the recent research and survey of Dr. Rappeport

presented to this Court on behalf of Plaintiff J & J,[2] classifying the "BREAK & BAKE" mark as a suggestive mark; (2) all the evidence presented in the application for the preliminary injunction, including a linguistic study by Dr. Michaelis that this Court, in *J & J Snack I*, found may contain factual issues; and (3) the IRI market data and research company report submitted on behalf of Defendant Earthgrains identifying "break and bake" as a generic mark—leaves any genuine issues of material fact to be determined by a jury regarding whether Earthgrains is in violation of trademark laws because it uses the phrase "Break 'N Bake" on its store brand refrigerated cookie dough. Prior to deciding this issue, the Court will detail the plaintiff's proposed expert opinion evidence to decide if it is admissible under Rule 702, Fed. R. Ev., and therefore relevant to the Court's determination of summary judgment.

2. On July 22, 2002, this Court wrote to counsel for the parties to inquire whether any further hearing was necessary before this Court could rule upon the admissibility of Dr. Rappeport's survey. Specifically, the Court wrote "[i]n the course of ruling upon the pending summary judgment motion, it is necessary to make a determination about the admissibility of Dr. Rappeport's opinion under *Daubert*. This subject was addressed by counsel at the oral argument on May 2, 2002, and it would appear that the record is sufficient to determine admissibility of this expert's opinion." (Letter from Court to Messrs. Pecsenye and Lehv of July 22, 2002.) The Court then instructed if "either party feels that the present record is incomplete for the Court to make a determination on this issue, please advise in writing within five (5) days of the date of this letter, including in such letter a proffer of the testimony or other evidence sought to be adduced at a further hearing." (*Id.*)

 On July 29, 2002, Mr. Lehv, on behalf of Earthgrains, replied that the record was sufficient for ruling on the Rappeport issue and that no further hearing was necessary. ( *See* Letter from Lehv to Court of July 29, 2002.)

## C. *Background Regarding Trademark Classification*

▮ A mark is only protected by trademark law if it is distinctive because the "public recognizes it as identifying the claimant's 'goods or services and distinguishing them from those of others.'" *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d Cir.1986) (quoting 1 McCarthy, *Trademarks and Unfair Competition* § 15:1 at 657 (2d ed.1984)). For the purpose of deciding whether a trademark is distinctive, courts have traditionally divided marks into four categories: (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful. *A.J. Canfield*, 808 F.2d at 296. Arbitrary or fanciful terms [3] and suggestive terms [4] are inherently distinctive, and are thus valid marks that are automatically protected by trademark law. *See Fisons Horticulture Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 (3d Cir.1994) (citing *Ford Motor Co. v. Summit Motor*

On July 30, 2002, Mr. Pecsenye, on behalf of J & J, responded with a letter requesting that Mr. Lehv's response not be considered. ( *See* Letter from Pecsenye to Court of July 30, 2002.) Mr. Pecsenye did not address the Court's inquiry and did not indicate whether or not he felt a *Daubert* hearing was necessary for an admissibility decision on the Rappeport issue. (*Id.*) By his silence upon that matter, Mr. Pecsenye's position is construed as an indication that Plaintiff also agrees that the record is complete for a *Daubert* determination.

3. An arbitrary or fanciful mark is one that bears "no logical or suggestive relation to the actual characteristics of the goods." *A.J. Canfield*, 808 F.2d at 296 (quoting *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 374 n. 8 (1st Cir.1980)).

4. A suggestive mark "suggest[s] rather than describe[s] the characteristics of the goods." *A.J. Canfield*, 808 F.2d at 296. It requires "consumer 'imagination, thought, or perception' to determine what the product is." *J & J Snack I*, 149 F.Supp.2d at 147 (quoting *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 222 (3d Cir.2000)).

*Prods.*, 930 F.2d 277, 291 (3d Cir.1991)). Descriptive terms [5] are generally not distinctive; they are only protected if the claimant proves that the mark is distinctive because it has gained secondary meaning with the consuming public as an identifier of the source of a specific product. *A.J. Canfield*, 808 F.2d at 297. Generic marks [6] are never protected by trademark law because, even if consumers connect the mark with a product, others cannot be prevented from also calling the product by its name. *Id.; see also interState Net Bank v. NetBank, Inc.*, 221 F.Supp.2d 513, 517 (D.N.J.2002).

The resolution of this matter depends greatly on the classification of the "BREAK & BAKE" mark. Plaintiff J & J argues that the mark is entitled to trademark protection because it is a suggestive mark or, alternatively, is a descriptive mark with secondary meaning. Defendant Earthgrains argues that the mark is not entitled to trademark protection because it is a generic mark or, alternatively, is a descriptive mark without secondary meaning. The evidence presented in this case, therefore, generally relates to the proper classification of the "BREAK & BAKE" mark.

### D. Admissibility of Evidence

#### 1. Rappeport Survey

J & J offers the market survey by Dr. Rappeport, which by Rappeport's own admission, does not address the issue of whether the "BREAK & BAKE" mark is descriptive (*see* Bessinger Decl., Ex. 27, Rappeport Dep., 11/28/01, Tr. 216:20–219:6), along with a report conducted by RL Associates, Rappeport's market research company. (*see* Bessinger Decl., Ex. 28.) J & J offers the opinion of Dr. Rappeport as evidence that the mark should be classified as "suggestive" (and thus protected) instead of "generic" or "descriptive." Dr. Rappeport has proffered his opinion, based on the results of his survey conducted on the BREAK & BAKE mark, that respondents found the mark to be suggestive, not merely descriptive.[7] (Bessinger Decl., Ex. 27 at 12–14.) Rappeport also decided that BREAK & BAKE is a "claiming slogan," which he self-defines as "a term that makes some form of an efficiency claim (*e.g.* better results, ease of use, low cost, etc.)" (*Id.* at 1.) By this, he meant, according to his deposition testimony, that consumers "see it as a slogan of how you use a particular product." (Rappeport Dep. at 63.)

5. A descriptive mark "describe[s] the purpose, function or use of the product, a desirable characteristic of the product, or the nature of the product." *J & J Snack I*, 149 F.Supp.2d at 147 (citing 2 McCarthy, *Trademarks and Unfair Competition* § 11:16). It is a mark that "immediately conveys knowledge of the ingredients, qualities or characteristics of the product." *interState Net Bank v. NetBank, Inc.*, 221 F.Supp.2d 513, 517 (D.N.J. 2002).

6. A generic mark "function[s] as the common descriptive name of a product class." *A.J. Canfield*, 808 F.2d at 296. · It is a term that describes the product class in such a way that "there is no commonly used alternative that effectively communicates the same functional information." *J & J Snack I*, 149 F.Supp.2d

at 145 (quoting *A.J. Canfield*, 808 F.2d at 306).

7. Rappeport found that 79% of all grocery shoppers and 80% of regular cookie dough buyers had never seen the mark before, and that of these shoppers, less than half were able to guess the specific dough product sold under the mark, with only 7% guessing cookies and 29% guessing dough products. (Bessinger Decl., Ex. 28.) Overall, however, nearly half of the respondents (48%) said they thought this mark would be used for bakery products. (*Id.* at 13.) He also found that a slight majority of respondents who had not seen the mark before either thought it referred to more than one type of product or did not know if it did. (*Id.*)

Earthgrains asserts (1) that Rappeport's opinion and report are inadmissible because they are seriously flawed because Rappeport made up his own definitions for descriptive and suggestive marks which are unsupported by case law; (2) that the opinion and report are inadmissible because Rappeport's expert fee was contingent upon producing a survey result that assisted Plaintiff's case; and (3) that even if Rappeport's survey is determined to be admissible and considered upon this motion for summary judgment, it identifies no genuine issue of material fact remaining to be determined by a jury.

 The Court must thus determine as a threshold issue whether Rappeport's opinion and report are admissible. Because the Court is satisfied that the expert fee arrangement was proper,[8] the issue here is whether Rappeport's survey design and execution are sufficiently reliable and appropriate to the facts in this case so that his resulting opinion is admissible under Rule 702 of the Federal Rules of Evidence.[9] Both parties argued this issue

8. The Court carefully considered Earthgrains' serious allegation that Dr. Rappeport was retained to conduct his survey on a contingent basis for his opinion in this case. A contingent fee arrangement with an expert witness would be unethical, and would undermine or destroy the reliability of the survey design and execution. *American Home Prods. Corp. v. Barr Labs.*, 656 F.Supp. 1058, 1062 (D.N.J. 1987) (explaining that interview must be conducted independently from attorneys involved in the litigation). At the Court's request after oral argument, the parties submitted letters clarifying the status of Dr. Rappeport's fee agreement. Plaintiff asserted that Dr. Rappeport was paid a non-contingent flat-fee to conduct a qualitative phase pilot study and then another non-contingent flat-fee to conduct a quantitative final study. (*See* Letter from Pecsenye to the Court of May 8, 2002 at 1–2.) Plaintiff admitted that Dr. Rappeport discounted or waived his fee on two occasions over the course of thirty years, but asserted that those discounts were given because survey errors made the results unusable, not because the results were adverse to the clients' positions. (*See id.*) Plaintiff attached a list of cases in which Dr. Rappeport's opinions were found admissible, and asserted that since 1995, Dr. Rappeport's surveys had never been deemed inadmissible. (*Id.* at 2.)

Defendant's response disputed Plaintiff's contentions and cited to Dr. Rappeport's testimony. (*See* Letter from Lehv to Court of May 15, 2002.) Specifically, Defendant quoted Dr. Rappeport as saying, "every once in a while we're surprised we don't get the answers we expect. But, fortunately, that happens rarely, since we don't charge if we don't get the answers we thought we'd get." (Bessinger Decl., Ex. 28, Rappeport Tr. 45:6–10.) Further, Rappeport testified that if the quantitative final results were much worse than expected, "we'd probably wind up not charging ... for it. And that happened in the neighborhood of once a year." (*Id.* Tr. 45:23–46:5.) Mr. Lehv also contested the statement that Dr. Rappeport's studies have never been found unreliable and inadmissible, citing to several recent decisions. (*See* Letter from Lehv to Court of May 15, 2002, 3–4, citing *Nat'l Distillers Prods., Co. v. Refreshment Brands, Inc.*, 198 F.Supp.2d 474 (S.D.N.Y. 2002); *Cumberland Packing Corp. v. Monsanto Co.*, 140 F.Supp.2d 241 (E.D.N.Y.2001); *Pilates v. Current Concepts, Inc.*, 120 F.Supp.2d 286, 304 (S.D.N.Y.2000); *Avent America, Inc. v. Playtex Prods., Inc.*, 68 F.Supp.2d 920, 930 (N.D.Ill.1999))

Plaintiff replied by letter and reasserted that Dr. Rappeport was not retained on a contingent basis in this case. (*See* Letter from Pecsenye to Court of May 21, 2002.)

The Court does not need to decide this issue now, which goes to the weight and possible bias of Dr. Rappeport's survey. As discussed below, this Court finds that Dr. Rappeport's survey is inadmissible under Rule 702, Fed. R. Ev.

9. Rule 702, Fed. R. Ev., as amended, provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the

extensively and have submitted supplemental written support for their positions. The parties acknowledge that this Court has the discretion to make an admissibility determination on the expert report on a motion for summary judgment. (Argument Tr. 39:7–40:9.) *See also* Fed. R. Ev. 702 advisory committee's note (2000); 4 Joseph M. McLaughlin, *Weinstein's Federal Evidence* § 702.05[4]. This threshold determination of the admissibility of proposed expert testimony is governed by the principles of *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

■■■■■ An expert opinion submitted in opposition to a motion for summary judgment, such as J & J's Rappeport survey, must be based on established facts and must detail the methodologies employed. *See* Daniel R. Coquillette, et al., *Moore's Federal Practice*, § 56.14[1][e] at 56–169–70 (3d ed.2002)(citing cases). Generally, exclusion of an admissible and relevant expert opinion is reversible error, even where the court determines that the submission was far outweighed by the other evidence. *Id.* at 56–170. If the expert report, however, is not admissible or if it would be confusing or unhelpful, the court may decline to consider the expert evidence on a motion for summary judgment.

*Id.* (citing *Slaughter v. Southern Talc Co.*, 919 F.2d 304, 306–07 (5th Cir.1990)). Additionally, this Circuit has held that a court may grant summary judgment even where the opponent presents admissible expert testimony, if that testimony is insufficient to support a jury verdict in favor of the party offering the evidence on a crucial element of the claim. 4 *Weinstein's Federal Evidence* § 702.05[4] n. 63 (citing *Oddi v. Ford Motor Co.*, 234 F.3d 136, 158 (3d Cir.2000)(trial court properly granted summary judgment after excluding expert testimony as unreliable, without specific evidentiary hearing,[10] on basis of expert materials submitted in opposition to motion for summary judgment, which provided sufficient information for reliability assessment)).

■■■■■ Survey evidence has been allowed in trademark cases. *See* 4 *Weinstein's Federal Evidence* § 702.06[3] n. 59. Its admissibility is dependent upon the qualification of the witness, the helpfulness of the testimony to the trier of fact, and the reliability and fit of the testimony. *Id.* at n. 61. Dr. Rappeport's qualifications as an expert witness are not at issue. Rather, the helpfulness and reliability or fit of the survey are challenged by Earthgrains which alleges that the survey has definitional problems, (Argument Tr. 7:4–17, 33:9–15), and fails to address the key issue,

---

witness has applied the principles and methods reliably to the facts of the case.

**10.** As discussed earlier, note 2, *supra*, the Court inquired of the parties whether an additional evidentiary hearing would be necessary to determine the admissibility of Dr. Rappeport's survey and opinion. ( *See* Letter from Court to Counsel of July 22, 2002.) Neither party indicated that an additional hearing was necessary. ( *See* Letter from Lehv to Court of July 29, 2002; Letter from Pecsenye to Court of July 30, 2002.) Thus, both parties were invited to submit further evidence, including testimony at a hearing, if they desired further

opportunity to be heard upon the admissibility of the Rappeport survey and opinion, as required by *In re TMI Litigation*, 199 F.3d 158, 159 (3d Cir.2000). *See also Padillas v. Stork–Gamco, Inc.*, 186 F.3d 412, 417 (3d Cir.1999) (requiring development of suitable factual record for the admissibility determination). Finding the record (including the deposition of Dr. Rappeport and his full survey and report, together with the May 2, 2002 oral argument) to be sufficient, this Court did not require a further evidentiary hearing on this matter under Rule 104, Fed.R.Civ.P. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 154–55 (3d Cir.2000).

namely, whether the "BREAK & BAKE" mark is descriptive, (*Id.* at 12:18–14:10).

■ This Court recognizes that methodological deficiencies in a survey generally relate to the weight given the survey's conclusions rather than to its admissibility. *See, e.g. E & J Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1292 (9th Cir. 1992); *Brunswick Corp. v. Spinit Reel Co.,* 832 F.2d 513, 523 (10th Cir.1987). However, when the deficiencies are so substantial that they render the survey's conclusions untrustworthy, the court should exclude the survey from evidence. *See Spraying Systems Co. v. Delavan, Inc.,* 975 F.2d 387, 394 (7th Cir.1992) (affirming summary judgment by finding consumer survey too flawed to create genuine issue of material fact because questions were biased and not reliable); *Universal City Studios, Inc. v. Nintendo Co.,* 746 F.2d 112, 118 (2d Cir. 1984) (finding survey "so badly flawed that it cannot be used to demonstrate the existence of a question of fact on the likelihood of consumer confusion"). Significant methodological deficiencies lessen the survey's probative value so that its probative value is substantially outweighed by the prejudice, waste of time, and confusion that it would cause at trial. Fed. R. Ev. 403; *Starter Corp. v. Converse, Inc.,* 170 F.3d 286, 297 (2d Cir.1999) (affirming Rule 403 exclusion of survey evidence that amounted to "little more than a memory test"). As a result, the court should exclude such a survey from evidence.

■ The Third Circuit identified the characteristics of a properly conducted survey as follows:

A proper universe must be examined and a representative sample must be chosen; the persons conducting the survey must be experts; the data must be properly gathered and accurately reported. It is essential that the sample design, the questionnaires and the manner of interviewing meet the standards of objective surveying and statistical techniques. Just as important, the survey must be conducted independently of the attorneys involved in the litigation. The interviewers or sample designers should, of course, be trained, and ideally should be unaware of the purpose of the survey or the litigation.

*Pittsburgh Press Club v. United States,* 579 F.2d 751, 758 (3d Cir.1978) (citing Judicial Conference Study Group, *Handbook of Recommended Procedures for the Trial of Protracted Litigation,* 25 F.R.D. 351, 429 (1960))[11]. The factors are non-exclusive, but it remains essential to consider whether the population and terms were properly defined, whether the design, questionnaires, and interviews met objective standards, whether data was accurately collected and reported, whether data was properly analyzed, whether the questions asked were unrelated to the material issues of the case, whether questions were unfairly leading, and whether questions were confusing. *See 4 Weinstein's Feder-*

**11.** *See also Manual for Complex Litigation (Third)* § 21.493 (1995) (stating that review of a survey made for the purpose of generating data about a population to be offered for its truth should consider whether "the population was properly chosen and defined; the sample chosen was representative of that population; the data gathered were accurately reported; and the data were analyzed in accordance with accepted statistical principles," and that review of a survey made for the purpose of measuring opinions, attitudes, and actions should also consider whether "the questions asked were clear and not leading; the survey was conducted by qualified persons following proper interview procedures; and the process was conducted so as to ensure objectivity"); Federal Judicial Center, *Reference Manual on Scientific Evidence (Second)* § 229 (2000) (detailing issues that must be considered to ensure objectivity, clarity, and relevance of survey, such as the purpose of the survey, the survey's methodology, the population sampling, the survey instrument, any interviewer training, and the statistical analysis used to interpret results).

*al Evidence* § 702.06[3]. Above all, the survey's design must fit the issue which is to be decided by the jury, and not some inaccurate restatement of the issue, lest the survey findings inject confusion or inappropriate definitions into evidence, confounding rather than assisting the jury. Only if the expert testimony and related survey are useful, reliable, and have probative value after all their deficiencies are taken into account is the evidence admissible.

In this case, the Rappeport survey suffers from two substantial flaws that show that it is not trustworthy and is not admissible. The first, and perhaps clearest, flaw is the uncontroverted definitional problems of the survey. (Argument Tr. 12:4–17, 33:9–15.) The survey was submitted to show the mark should be classified as "suggestive" instead of "generic" or "descriptive," but it did not properly define any of the classifications. Because the classifications were not properly-defined, the survey has no bearing on the issue it was submitted for.

To indicate the definitional flaws, this Court will focus on the legal definition of a "descriptive" trademark. The study defined "descriptive" marks as those which "bring to mind a specific product, but are not the common way of referring to the product category." (Bessinger Decl., Ex. 27 at 2.) This Court had previously discussed in detail and with numerous citations to case law the proper definition of a descriptive term. *See J & J Snack I*, 149 F.Supp.2d at 147–51. Specifically, this Court explained that "descriptive marks describe the purpose, function or use of the product, a desirable characteristic of the product, or the nature of the product." *Id.* at 147. Dr. Rappeport had a copy of this Court's *J & J Snack I* opinion. (Bessinger Decl., Ex. 28, Tr. 15:3–19.) Yet, the Rappeport definition includes nothing that refers in any way to the correct, recog-nized and binding definition of a descriptive term under trademark law. In fact, Dr. Rappeport admitted at deposition that his definition, and thus his survey, did not deal with whether the mark described a purpose, function or use of the product. The dialogue proceeded as follows:

Q: Does your survey tell us whether Break & Bake describes the purpose of the J & J Snack Food product? . . .

A: The purpose is to make cookies. But—I don't understand what the word purpose means there. I don't have a purpose when I buy something unless it's to eat the stuff.

Q: Does your survey tell us whether Break & Bake describes how you use the J & J product? . . .

A: No, it's not aimed at talking about whether the Break & Bake tells you how to go about using it, which is what I think—I assume that's what you really mean is, what do I do when I buy the product, because purpose has no meaning to me at all. . . .

Q: Does your survey tell us whether Break & Bake describes a desirable characteristic of the J & J product? . . .

A: No, it doesn't tell you whether it does that.

Q: It doesn't tell you whether it does that? . . .

A: I'm sorry, the survey does not tell you whether it describes a desirable characteristic of the J & J product.

(Bessinger Decl., Ex. 28, Tr. 216:5–219:6.)

This flaw in the definition of a "descriptive" mark is substantial because the flawed definition was used as the basis for Dr. Rappeport's conclusion that the mark was suggestive. As a result, the flawed definition permeated the entire survey to make its finding completely untrustworthy

and unreliable. Under principles of trademark law, an expert's conclusion that a mark is not descriptive under the definition "bring[s] to mind a specific product, but [is] not the common way of referring to the product category" has no relevance or bearing on whether the mark is descriptive under the proper legal definition of a descriptive mark as one that "describe[s] the purpose, function or use of the product, a desirable characteristic of the product, or the nature of the product." Rappeport admitted that incorrect definitions would undermine his survey's findings at his deposition. (Bessinger Decl., Ex. 28, Tr. 94:9–95:6.) When asked "[i]f it turns out that your understanding of these terms, generic, descriptive, suggestive, is not correct, what is the implication for your survey," Dr. Rappeport answered, "[i]t undercuts the survey to the degree that they're incorrect and that the data doesn't support what the, quote, proper definitions are." (*Id.*)

Likewise, Rappeport's attempt to classify this mark as a "claiming slogan," (Bessinger Decl., Ex. 27 at 1), at best adds definitional confusion and at worst proves that the mark is indeed descriptive. Rappeport's "claiming slogan" is, in his view, "an efficacy claim" like a claim of "better results, ease of use, low cost." (*Id.*) If so, Dr. Rappeport has explained the essence of a "laudatory term," which is a term descriptive of the claimed merit of the product, and which is regarded as a type of descriptive mark. *See* 2 McCarthy, *Trademarks and Unfair Competition,* § 11:17 (and cases cited therein). By finding that this mark is a claiming slogan, Dr. Rappeport actually found it to be descriptive as a matter of law, contrary to his opinion that it is a suggestive term. The mark, indeed, is "a slogan of how you use a particular product," (Bessinger Decl., Ex. 28, Tr. 63:23–24), which is a hallmark of a descriptive term, and not of a suggestive term.

Dr. Rappeport, to find that the mark is not "descriptive," invented his own new definition of "descriptive," namely, a term that "bring[s] to mind a specific product." (Bessinger Decl., Ex. 27 at 2.) This does not even resemble the correct meaning of "descriptive," as noted above, and renders his findings unreliable and confusing.

The second flaw in the survey is that the universe chosen for the survey was improper. It is clear that "the closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results." 5 McCarthy, *Trademarks and Unfair Competition* § 32:163; *see also Am. Home Prods. Corp. v. Barr Lab.,* 656 F.Supp. 1058 (D.N.J.1987), *aff'd,* 834 F.2d 368 (3d Cir.1987) (stating that a survey should sample "the full range of potential [consumers] for whom plaintiff and defendants" compete).

The survey here, however, did not imitate the market conditions of the J & J product at all. It is undisputed that J & J sells all of its frozen cookie dough product with the "BREAK & BAKE" mark through its food service distributors to distributors who offer the product to fund raising organizations. (Pl.'s Br. at 3.) According to J & J's Vice President of Marketing, Michael Karaban, because the product is only sold to commercial distributors in the food service industry, the ultimate consumer would not know the product because it has not been advertised to consumers. (Valenti Decl., Ex. C, Tr. 55:11–56:18.) As a result, the market conditions for the J & J study should have been limited to the commercial distributors in the food service industry who may have contact with frozen dough products. Then, responses to questions about whether they think the mark is associated with one company or more than one company

would be based on experience with the product. Instead, the universe here consisted of adults shopping at one of four malls in the United States who either "do at least some of the grocery shopping for their household," (Bessinger Decl., Ex. 27 at 4), or "have purchased refrigerated cookie dough in the past and/or . . . intend to purchase refrigerated cookie dough in the future," (*Id.* at 3). This universe renders the study unreliable as it ignores the fact that the ultimate consumer does not have any contact with the "BREAK & BAKE" mark on J & J's product. In addition, it only concerns the views of ultimate consumers who purchase or may purchase refrigerated dough when J & J's product is unquestionably frozen.

The improper sampling universe is further compounded by the survey's design flaw of failing to disclose to respondents the context of the product with which the mark is connected. The Rappeport survey instead asked shopping mall customers to guess about this context. Again, such a survey misses the mark where descriptiveness is sought to be ruled out. This is true because the survey must supply to "the hypothetical potential customer" the "amount of basic knowledge about the product that most people would have from news and advertising." 2 McCarthy, *Trademarks and Unfair Competition,* § 11:21. Without supplying the context of a cookie product to consumers, their guesses about the nature of a "BREAK & BAKE" product do not supply material information, because the question of descriptiveness is not determined in the abstract, but in the actual context of the mark's use. Stated differently:

> [T]he question of whether a mark is merely descriptive must be determined

not in the abstract, that is, not by asking whether one can guess, from the mark itself, considered in a vacuum, what the goods and services are, but rather in relation to the goods and services . . . that is, by asking whether, when the mark is seen on the goods or services, it immediately conveys information about their nature.

*In re Patent & Trademark Servs., Inc.,* 1998 WL 970180, 49 U.S.P.Q.2d 1537, 1539 (Trademark Tr. & App. Bd.1998). Thus, the survey instrument here, absent any context for the manner in which the term is connected to a product, was fatally structurally flawed.

Therefore, because this Court finds that Dr. Rappeport's survey suffers from substantial flaws, it is unreliable and inadmissible under Rule 702, Fed. R. Ev. As a result, the survey will not be considered in this motion for summary judgment. *See* Fed.R.Civ.P. 56(e).

### 2. *IRI Report*

■ Earthgrains submitted new evidence collected during the time after the preliminary injunction decision in the form of an Information Resources, Inc. ("IRI") report. (*See* Brown Decl., Exs. 25 and 26; Brown Supp. Decl. ¶¶ 1–7.) IRI is a respected leader in market research and sales information which compiles consumer data from supermarket, drug store, and other retail locations. (Brown Decl. ¶ 2; Brown Supp. Decl. ¶ 2.) IRI sorts the data into categories and provides information on sales volume, market share, distribution and pricing. (Brown Decl. ¶ 2.) The information is maintained in a database, to which clients such as Earthgrains have access.[12] (Brown Supp. Decl. ¶¶ 3–4.)

---

12. In its opposition brief, Plaintiff argues that the IRI reports are forgeries which reflect the views of Earthgrains. (Pl.'s Opp. Br. at 9.) Plaintiff offers no evidence whatsoever in support of that allegation. Defendant, on the other hand, have supplied two declarations detailing the function of IRI and its reports and their use within the industry. ( *See*

Clients, such as Earthgrains, cannot change or alter the product categories that are selected and defined by IRI. (*Id.* ¶¶ 4–5.)

The IRI report generated for this case lists information for the refrigerated cookie dough product category for the week ending December 16, 2001. (Brown Decl. ¶ 4, Ex. 25.) The IRI report refers to a generic product segment within the refrigerated cookie dough segment as "Break & Bake" and "Break and Bake" cookies, and includes Pillsbury, Nestle, and several private label brands in that segment. (*Id.* ¶ 5, Ex. 25.) The "Break and Bake" product segment includes all refrigerated preformed and pre-scored cookie products, even those that do not use the "break and bake" phrase in their name. (*Id.*) Todd A. Brown, president of Sara Lee, formerly Earthgrains, represents that the IRI data, which uses "break and bake" as a generic term to refer to a segment of the refrigerated cookie dough category, is consistent with the way such products are regarded in the industry and by consumers on the whole. (*Id.* ¶ 6.) This evidence is clearly relevant to the Court's determination of the classification of the "BREAK & BAKE" mark so will be considered on this motion for summary judgment. The evidence strongly supports the notion that the phrases "break and bake" or "break & bake" have achieved generic meaning in the food industry, describing a category of products rather than the origin of any product.

### 3. *Linguistic Report of Laura A. Michaelis, Ph.D.*

█ J & J also offers the report of Dr. Laura A. Michaelis, entitled "The Linguistic Status of the Expression *break and bake.*" (Bessinger Decl., Ex. 29.) Earthgrains challenges the admissibility of Dr. Michaelis's report, asserting that she did not review the affidavits in this case, she mistakenly stated that all parties sell pre-scored sheets of refrigerated cookie dough, she mixed linguistic and legal rules and definitions, and she based her conclusion on inadequate factual research. (Def.'s Br. at 26–32.)

The Michaelis report first concludes that the phrase "break and bake" is highly unconventional and therefore would cause a reader to pause and backtrack over the phrase, even more so than a more common phrase, such as slice and bake, would. (Bessinger Decl., Ex. 29 at 2.) Dr. Michaelis believes that the term is not descriptive, because not all adult native speakers would be able to recognize that the phrase "break and bake" describes cookie dough. (*Id.*) The report finds that the phrase is unique because it involves a creative and coordinate verb break, which results in an unexpected and playful use of words. (*Id.* at 2–3.) Dr. Michaelis also notes that the use of the word break in reference to cookie dough forces readers to expand the traditional semantics associated with the word. (*Id.* at 3–4.) Finally, Dr. Michaelis finds that placing the two verbs "break" and "bake" together creates a novel pairing of actions, linked as cause and effect. (*Id.* at 4–5.)

After conducting the above four-step linguistic analysis of the term "break and bake," Dr. Michaelis reports that her linguistic conclusions show the phrase is legally suggestive and is not descriptive. (*Id.* at 6.) Dr. Michaelis finds that interpretive work is needed on the part of the consumer to "get" what the phrase "break and bake" means in the cookie dough context. (*Id.*) She concludes, therefore, that "break and bake" is a suggestive phrase. (*Id.*)

Brown Decl. ¶¶ 1–6; Brown Supp. Decl. ¶¶ 1– 7.)

This report, in contrast to Dr. Rappeport's survey, is highly academic and is clearly structured around the four areas of linguistic theory (conventionality, creativity or innovation, verb use, and novel conjunction of action verbs), described by Dr. Michaelis in her report. The challenges raised by Earthgrains to Dr. Michaelis's report go to weight rather than to admissibility. Dr. Michaelis uses common definitions in her survey and applies researched internet data to linguistic theories, upon which she bases her conclusions. Dr. Michaelis's opinion is thus sufficiently based on established facts and it adequately details the methodologies employed therein. Therefore, this opinion is admissible, but, as discussed below, fails to raise genuine issues of material fact for a jury.

### E. *Analysis*

The Court having determined that, under Fed. R. Ev. 702, the Rappeport Report is inadmissible and the IRI and Michaelis Reports are admissible, it is now necessary to evaluate the admissible evidence that is before this Court to determine whether, extending all favorable inferences to J & J, Defendant Earthgrains has met its burden of showing that there is no genuine issue of material fact remaining in this case and that it is entitled to judgment as a matter of law. The evidence presently before the Court is largely the same evidence considered in June, 2001 on Plaintiff's application for preliminary restraints, with the addition of Earthgrains' evidence relating to the IRI report. The Michaelis Linguistic Report was available in June 2001, but this Court deferred analysis on whether it raised an issue of fact at that time. As a result, this Court will now consider the summary judgment motion considering all the evidence, but because of this Court's findings in *J & J Snack I*, will primarily focus on the IRI Report and the Michaelis Linguistic Report.

This motion involves the allegations of J & J that Earthgrain's use of the "Break & Bake" mark constitutes federal trademark infringement and unfair competition under §§ 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1)(a) and 1125(a) (Counts I and II), common law trademark infringement and unfair competition (Counts III and IV), and unfair competition under New Jersey statute 56:4–1 and common law (Count V). The Court will first consider whether there is a genuine issue of material fact regarding Plaintiff's trademark infringement claim under the Lanham Act. Then, because the elements for a claim for trademark infringement under the Lanham Act are the same as the elements for a claim of unfair competition under the Lanham Act and for claims of trademark infringement and unfair competition under New Jersey statutory and common law, this Court will extend the analysis accordingly.

### 1. *Federal Claims under the Lanham Act*

■ To establish a claim of trademark infringement under § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), or federal unfair competition under 43(a) of the Lanham Act, 15 U.S.C. 1125(a), a plaintiff must show that (1) it owns the mark; (2) its mark is valid and legally protectable; and (3) the Defendant's use of the mark to identify its goods or services is likely to create confusion concerning the origin of those goods or services. *See J & J Snack I*, 149 F.Supp.2d at 144 (citing *Commerce Nat'l Ins. Servs. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 437 (3d Cir.2000)). Here, there is no dispute that J & J owns the "Break & Bake" mark which was originally registered by its predecessor Schwan on January 16, 1996. Therefore, this Court must decide whether there is a genuine issue of material fact regarding (a) the validity and protectibility of Plaintiff's

mark, or, if necessary, (b) the likelihood of confusion if Earthgrains uses the "BREAK 'N BAKE" mark.

### (a) Validity and Protectability of the Mark

█ The threshold issue in an action for trademark infringement is whether the word or phrase is protectable by trademark law. *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 790 (5th Cir.1983). If the mark is federally registered and has become incontestable through continuous use for five years after registration with no pending proceeding that is contesting the owner's rights, then validity and protectability of the mark are proven as a matter of course. *Commerce Nat'l*, 214 F.3d at 438. If however, the mark is registered, but has not achieved incontestability, as is the case here,[13] the mark must be inherently distinctive or must have proof of secondary meaning. *Id.* at 438. The distinctiveness and protectability of a mark is determined by considering the classification of the mark. Trademark law groups marks into four categories: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 221–22 (3d Cir.2000).

Generic terms do not enjoy trademark protection. *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 305–06 (3d Cir.1986). A mark is "generic" if it is the common name for a class of products rather than the name of the individualized product. *Harlem Wizards Entm't Basketball, Inc. v. NBA Prop., Inc.*, 952 F.Supp. 1084, 1092 (D.N.J.1997); *see also A.J. Canfield*, 808 F.2d at 308 (finding "chocolate fudge" is generic term for chocolate-fudge flavored soda); *DuPont Cellophane Co. v. Waxed Products Co.*, 85 F.2d 75 (2d Cir.1936) (finding "cellophane" is generic); *interState Net Bank v. NetBank, Inc.*, 221 F.Supp.2d at 526 (D.N.J.2002) (finding "net bank" is generic term for internet banking services); *Bayer Co. v. United Drug Co.*, 272 F. 505 (S.D.N.Y.1921) (finding "aspirin" is generic for pain medication). A word may be generic when referring to some products, but not generic toward others. For example, "ivory" is generic with respect to elephant tusks, but is arbitrary as applied to soap. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976). A generic term is never protectable under trademark law because "even complete 'success ... in securing public identification ... cannot deprive competing manufacturers of the product of the right to call an article by its name.'" *Net Bank*, 221 F.Supp.2d at 517 (citing *Abercrombie & Fitch*, 537 F.2d at 9).

Descriptive terms only enjoy trademark protection if they have acquired a secondary meaning in the minds of the consuming public. *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 104 F.Supp.2d 427, 458 (D.N.J.2000), *aff'd*, 269 F.3d 270 (3d Cir.2001), (citing *Union Carbide Corp. v. Ever–Ready Inc.*, 531 F.2d 366, 380 (7th Cir.1976)). A mark is "descriptive" if it identifies a characteristic or quality of an article such as its color, odor, function, dimensions, or ingredients. *Zatarains*, 698 F.2d at 790 (citing *Vision Center v. Opticks, Inc.*, 596 F.2d 111, 115 (5th Cir. 1979); *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 11 (5th Cir.1974)); *see also* 2 McCarthy, *Trademarks and Unfair Competition*, § 11:16. The distinction between descriptive and

---

**13.** Plaintiff concedes that the "BREAK & BAKE" mark is not incontestable, though Plaintiff notes that it would have achieved incontestable status in January 2001 were it not for *J & J Snack I.* (Pl.'s Br. at 9 n. 3; Pl's Mot. Prelim. Inj. Earthgrains at 5 n. 1.)

generic marks is generally one of degree. *See, e.g. Aloe Creme Labs., Inc. v. Milsan, Inc.,* 423 F.2d 845 (5th Cir.1970) (finding "Alo" is descriptive when referring to products containing the gel of the aloe vera plant); *Vision Center,* 596 F.2d at 117 (finding "Vision Center" descriptive when referring to business offering optical lenses).

Suggestive terms are inherently distinctive and are protectable regardless of their meaning to the consuming public. *Fisons Horticulture Inc. v. Vigoro Indus., Inc.,* 30 F.3d 466, 472 (3d Cir.1994). They suggest, rather than describe, a particular characteristic of the good in a way that requires the consumer to imagine in order to conclude what the nature of the good is. *See, e.g. Douglas Labs., Inc. v. Copper Tan, Inc.,* 210 F.2d 453 (2d Cir.1954) (finding "Coppertone" is suggestive in relation to sun tanning products).

Arbitrary or fanciful terms are also deemed inherently distinctive and protectable under trademark law. Such terms bear no relationship to the product. *See, e.g. Eastman Kodak Co. v. Weil,* 137 Misc. 506, 243 N.Y.S. 319 (1930) (finding "Kodak" to be fanciful term for photographic supplies).

The classification of a given mark is a factual issue. *Ford Motor Co. v. Summit Motor Prods., Inc.,* 930 F.2d 277, 292 n. 18 (3d Cir.1991). This Court, therefore, must determine whether there remains any genuine factual issue regarding the classification of the "BREAK & BAKE" mark that could affect the resolution of this matter. Therefore, if facts are at issue that could cause a reasonable jury to decide the mark is a descriptive mark with secondary meaning or a suggestive mark, then the mark would be protected by trademark law and summary judgment for Defendant would be improper.[14] If, instead, the mark can only be classified as generic or as a descriptive mark without secondary meaning, the mark is not protected by trademark law and summary judgment is proper.

### (1) Whether the mark is "generic"

Defendant argues that summary judgment should be granted because the mark "BREAK & BAKE" is generic. In J & J Snack I, this Court found that Defendants had not produced sufficient evidence to show that the "BREAK & BAKE" mark was likely to be classified as generic. *J & J Snack I,* 149 F.Supp.2d at 146. Since then, the only addition to the record on this point is Defendant's IRI Report. Therefore, the issue here is whether the IRI Report is sufficient to overcome the evidence in *J & J Snack I* to show that the "BREAK & BAKE" mark is generic.

The IRI Report refers to "Bake and Break" cookies as a generic food category composed of products marketed by Pillsbury, Nestle, and several private labels, (Brown Decl. ¶ 5; Ex. 25), and Todd Brown, the president of Sara Lee, formerly Earthgrains, represents that this use of "break and bake" is consistent with the way the products are viewed in the industry and by consumers. (Brown Decl. ¶ 6.)

Yet, when this IRI evidence is viewed in the light most favorable to the non-moving party, J & J, this Court finds that it is insufficient to show, as a matter of law, that the term "BREAK & BAKE" is generic. The IRI Report does add to the record a significant trade reference to "break and bake" cookies, evidence that

---

**14.** Summary judgment would also be improper if the mark could be classified as arbitrary or fanciful. Here, however, the "BREAK & BAKE" mark is clearly not arbitrary or fanciful as it bears a direct relationship to the cookie product that, as J & J states on its sell sheet, requires the consumer to "[b]reak apart cookie dough and bake for delicious cookies." *J & J Snack I,* 149 F.Supp.2d at 148.

this Court specifically found lacking in *J & J Snack I*. However, when a plaintiff has a federally registered mark, the plaintiff enjoys a strong presumption that the mark is not generic. *J & J Snack I*, 149 F.Supp.2d at 145 (citing 2 McCarthy, *Trademarks and Unfair Competition* § 12:12). Here, there is no question that the "BREAK & BAKE" mark was registered in the principal register in January 1996 so that plaintiff enjoys the presumption that the mark is not generic. (Pl.'s Mot. Prelim. Inj. Nestle, Ex. B). Defendant's offer of the IRI Report does not overcome this presumption on a motion for summary judgment because, viewed in the light most favorable to J & J, the IRI study only indicates that one market research company has chosen to label some cookies "break and bake" to organize its data system. It does not necessarily prove that the consuming public or that commercial consumers of sheets of refrigerated or frozen cookie dough label it "break and bake." As a result, this Court will not grant summary judgment by finding the mark "BREAK & BAKE" is generic, as the weighing of that evidence would be left to the jury.

### (2) Whether the mark is "descriptive" or "suggestive"

J & J argues that this Court cannot grant summary judgment because the mark "BREAK & BAKE" is a suggestive mark that is entitled to trademark protection. Earthgrains argues that summary judgment should be granted because the mark is descriptive and is not entitled to trademark protection because it does not

have a secondary meaning to the consuming public.

In *J & J Snack I*, this Court found that it was highly unlikely that J & J would be able to prove that its mark was suggestive. *J & J Snack I*, 149 F.Supp.2d at 151. Since then, the only addition to the record is Defendant's IRI Report. However, this Court left open the question as to whether the linguistic report of Dr. Michaelis raises a factual issue about the suggestive nature of the phrase "BREAK & BAKE." Therefore, the issue here is whether Dr. Michaelis' report, in combination with all other evidence in this case, leaves a factual question about the classification of the mark. If a reasonable jury could find that the mark is suggestive based on all the evidence, including Dr. Michaelis' report, this Court cannot grant summary judgment.

The Court finds that Dr. Michaelis' report does not raise a genuine issue of material fact regarding the classification of "BREAK & BAKE" as a suggestive mark. To explain, this Court will consider the four findings that form the basis of Dr. Michaelis' conclusion that the mark is suggestive. First, though, it is important to detail five relevant factors to the determination of whether a mark is suggestive [15] or descriptive [16]: (1) the level of imagination, thought or perception required to reach a conclusion as to the nature of the goods; (2) the likelihood that competitors will need to use the term in connection with their goods; (3) the extent to which other sellers have used the mark on similar merchandise; (4) the likelihood

---

**15.** Suggestive marks require consumer "imagination, thought, or perception" to determine what the product is. *See A & H Sportswear*, 237 F.3d at 222. A mark, if found to be suggestive, is protectable even without proof of secondary meaning. 2 McCarthy, *Trademarks and Unfair Competition* § 11:62 (citing cases).

**16.** Descriptive marks describe the purpose, function or use of the product, a desirable characteristic of the product, or the nature of the product. *See* 2 McCarthy, *Trademarks and Unfair Competition* § 11:16 (citing cases). A descriptive mark is only protectible with proof of secondary meaning. *Id.*

that the mark will conjure up other purely arbitrary connotations separate from what the mark conveys about the product; and (5) the probability that consumers will regard the mark as a symbol of origin or as self-laudatory. *FM 103.1, Inc. v. Universal Broadcasting,* 929 F.Supp. 187 (D.N.J. 1996). In *J & J Snack I,* this Court found that the evidence showed the "BREAK & BAKE" mark was descriptive because (1) no imagination is needed to determine the meaning of "BREAK & BAKE"; (2) there is no better description for what the consumer does with the cookie dough than "BREAK & BAKE"; (3) competitors have selected and used the terms "BREAK & BAKE" as the easiest way to convey what must be done to the product; (4) the mark does not refer to an arbitrary connotation separate from the product; and (5) there is no probability that consumers will regard the mark as a symbol of origin. *J & J Snack I,* 149 F.Supp.2d at 147. The Michaelis report does not change this characterization of the mark. Upon review of the Michaelis study, it is clear to this Court that there is no genuine issue of fact regarding the classification of the "BREAK & BAKE" mark; it is not a suggestive mark.

Dr. Michaelis based her finding that the mark is suggestive on four linguistic models. First, Dr. Michaelis found that the mark contains an unconventional word pairing that is not often used by adult native speakers. (Bessinger Decl., Ex. 29 at 3.) To support her conclusion, Dr. Michaelis refers to a search for "break and bake" on the Google search engine. (*Id.* at 2.) Based on the few "hits" she found for the term, she concluded that the term must be "highly unconventional" and unique. (*Id.*) Dr. Michaelis does not base her assumptions on survey data or actual interaction with adult native speakers. Instead, she states,

> [o]ne can readily imagine adult native speakers who know of this type of product but who do not recognize break and bake as a description of that product . . . . [but] all adult native speakers can pick out instances of the category of items which can be described by the modifier blue . . . . one can conclude that the modifier break and bake is not descriptive.

(*Id.* at 2–3.)

This imagined adult native speaker who does not recognize "BREAK & BAKE" as a descriptor of cookies is not enough to raise an issue about the proper classification of the mark. No factual data backs up her claim that an adult may not recognize "BREAK & BAKE" except for an internet search. Interestingly, Defendant was able to find many more than four internet sites that mentioned "break and bake." (Mann Decl., Ex. 11.)

Regardless, even if the term is "unconventional" as Dr. Michaelis finds, the term is still not a suggestive term under trademark law. A suggestive term must suggest, rather than describe, a particular characteristic of the good. *Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1184 (5th Cir.1980); *Vision Center,* 596 F.2d at 115–16. Here, the "BREAK & BAKE" mark directly describes the process of preparing the cookies. (*See* Valenti Decl., Ex. C, Tr. 143:10–14 where J & J President Gerald Schreiber admits the mark "tells you really how to prepare this cookie.") While some may not have heard of "BREAK & BAKE" cookies or may not know that companies even make such cookie dough products, it does not change the fact that "BREAK & BAKE" is a succinct and exact definition of the use of this particular type of cookie dough.

Second, Dr. Michaelis found that the mark "BREAK & BAKE" was suggestive because it is novel, creative, and playful. (Bessinger Decl., Ex. 29 at 3.) She reasons that the juxtaposition of the two verbs

seems incongruous when related to cookie dough because people generally would not think of breaking cookie dough. (*Id.* at 4.) Therefore, she states that it must be a suggestive term because "[a] mere descriptor may be more or less accurate, but it will never be viewed as witty." (*Id.*)

This finding by Dr. Michaelis fails to raise a genuine issue about the classification of "BREAK & BAKE" because it fails to explain why "BREAK & BAKE" is suggestive rather than descriptive. Regardless of whether the term is "witty," the essential question here is whether it is suggestive or descriptive. Dr. Michaelis states that "BREAK & BAKE" might be a conceivable descriptive term for use of an egg, but that cookie dough is different because people do not usually break cookie dough. (*Id.*) When considering this particular dough, though, she finds that only the term "break off" would be descriptive of the consumer's action in separating the dough. (*Id.*) Since the term here is instead the word "break," she finds that this mark must be suggestive. (*Id.*)

Dr. Michaelis' finding on this matter does not create a factual issue over the classification of "BREAK & BAKE" as suggestive because the difference between a descriptive term and a suggestive term is not one of wittiness or conceivability, but depends on whether the term identifies a quality of the article or merely suggests the nature of the goods.[17] Here, the words "BREAK & BAKE" are conceivably illustrative of the nature of the cookie dough and they do describe the process needed to enjoy the cookies. The average consumer may not refer to "breaking" when discussing regular cookie dough, but this case is not about regular cookie

dough. It is about pre-scored or pre-formed cookie dough which must be separated by "breaking" or by "breaking off" the individual pieces from the sheet of frozen or refrigerated dough. Phrased either way, the mark still describes the use of the product, so it cannot be classified as a suggestive term.

Third, the Michaelis study finds that "BREAK & BAKE" must be suggestive because it juxtaposes a verb with a semantically inappropriate object. (*Id.* at 4.) Dr. Michaelis states that "BREAK & BAKE" cookies are as odd to the ear as saying that "I broke my pillow." (*Id.*) Because cookie dough is generally not "broken," she reasons that the term "break" can never be descriptive of cookie dough.

The problem with this reasoning is that the term "break" is descriptive of this particular type of cookie dough. The issue is not whether "break" is descriptive of all cookie dough; the issue is whether "break" is descriptive of this pre-formed cookie dough. Dr. Michaelis, in a way, admits that it is descriptive of this cookie dough, in that she states, "[i]t is only once we link the phrase break and bake to the product that we understand that the dough is a matrix and the breaking entails bending at a seam." (*Id.* at 5.) Therefore, this Michaelis finding also does not raise an issue of fact regarding whether the mark is descriptive or suggestive.

Fourth, Dr. Michaelis finds that the coordination of the verbs in the mark makes it a suggestive term. Dr. Michaelis considers the newness of the concept of breaking cookie dough to mean that the word "break" cannot describe the use of cookie dough. However, regardless of

---

17. It is interesting to note that the use of "BREAK & BAKE" with an egg could be seen as just as novel as the use of "BREAK & BAKE" with cookie dough. Cookies may not often be broken, but they are often baked. Eggs, on the other hand, may often be broken, but they are not often baked separate from other ingredients. As a result, the distinction between the egg and the cookie dough does not help support the Michaelis opinion.

how new the concept is, the term still describes this particular popular form of baking cookies without rolling pins, cookie cutters, or mixing spoons.

In sum, the principal flaw with the Michaelis study is the assumption that the term "break" needs to describe all cookie dough. Dr. Michaelis seems to assume that because it does not describe all cookie dough, it must be a more protected mark than a descriptive mark. As a result, she finds that "BREAK & BAKE" is a suggestive mark without ever indicating what it suggests. The issue in this case, though, is whether the term "BREAK & BAKE" describes this particular type of cookie dough or is a term that requires imagination, thought or perception to conjure up an association to the product. Based on the Michaelis study, as well as on the evidence explained in *J & J Snack I*, there is no genuine issue about whether "BREAK & BAKE" could be classified as a suggestive term. It cannot. As a result, the term is descriptive and this Court cannot deny summary judgment based on J & J's assertion that the term is a protectable suggestive mark.

### (3) Whether the mark has secondary meaning

■ Because the term is descriptive, this Court must decide if it has secondary meaning because descriptive terms are only protected by trademark law if they have acquired a secondary meaning for the consuming public. *Two Pesos Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). Secondary meaning is shown when the "primary significance of the term in the minds of the consuming public is not the product but the producer." *FM 103.1*, 929 F.Supp. at 194. Generally, secondary meaning is established by extensive advertising which connects the mark to the provider advertising the mark in the minds of the target consumer. *J & J Snack I*, 149

F.Supp.2d at 152 (citing *Commerce Nat'l*, 214 F.3d at 438). The more descriptive the mark, the heavier the evidentiary burden is on the plaintiff to establish secondary meaning. *Id.* (citing 2 McCarthy, *Trademarks and Unfair Competition* § 15:33 at 15–51).

■ The Third Circuit has listed nonexclusive factors to consider when determining the existence of secondary meaning: 1) the extent of sales and advertising that leads to consumer association; 2)length of use; 3) exclusivity of use; 4) the fact of copying; 5) customer surveys; 6) customer testimony; 7) the use of the mark in trade journals; 8) the size of the company; 9) the number of sales; 10) the number of customers; and 11) actual confusion. *Commerce Nat'l*, 214 F.3d at 438 (citing *Ford Motor*, 930 F.2d at 292). J & J, in its moving and reply briefs, addressed only the first factor, and claimed that the combined sales from 1996 to 2000 under the "BREAK & BAKE" mark by J & J and its predecessor were approximately $2 million. J & J has since offered no other evidence of secondary meaning, beyond the inadmissible Rappeport survey discussed above.

In *J & J Snack I*, this Court explained that this absence of evidence regarding secondary meaning showed an absence of secondary meaning. J & J has not submitted evidence of advertising campaigns or expenditures that would lead to consumer association of "BREAK & BAKE" with J & J. Plaintiff has argued that its continuous and exclusive use of the "BREAK & BAKE" mark from 1996 through 1999 should show secondary meaning, but this Court again finds that this use, without more, is not enough to establish secondary meaning. *See J & J Snack I*, 149 F.Supp.2d at 151–54. There is simply no evidence that anyone associates the phrase "BREAK & BAKE" with J & J.

Earthgrains' McCullough report, dated May, 2001 and submitted in support of its opposition to preliminary restraints, concludes that a majority of the survey respondents felt that "Break & Bake" was a common name and therefore had no secondary meaning connecting it to J & J. (*See* McCullough Survey at 3.) J & J has yet to contest the survey or conduct any customer survey of its own to provide support of its claim that its mark has secondary meaning.[18] J & J only argues that it will challenge the McCullough findings on cross-examination. (Pl.'s Br. at 12.) Yet it is not enough to contest the McCullough findings for it is not Earthgrains' burden to prove an absence of secondary meaning; J & J still needs independent proof of secondary meaning to sustain its claim. J & J has not provided this essential evidence despite ample time, resources and motivation.

As a result, the proof remains clear that J & J, a company with total sales in excess of $300 million per year, had only $2 million in sales for this product over a five year period, (*See* Nestle Opp., Ex. W, Schreiber Deposition Tr. 22:20–25; Scaramella Decl., Ex. 17, Tr. 139:13–18), and the record remains void of any evidence that connects this $2 million of sold products to J & J in the minds of consumers. As a result, this Court finds that no material issue of fact exists as to the secondary meaning of the "BREAK & BAKE" mark. Therefore, this Court finds that Plaintiff's "Break & Bake" mark is not protectable because it is a descriptive mark that has no secondary meaning.

### (b) Likelihood of Confusion

As stated *supra*, to succeed in a trademark infringement claim, a plaintiff must show that (1) it owns the mark; (2) its mark is valid and legally protectable; and (3) the Defendant's use of the mark to identify its goods or services is likely to create confusion concerning the origin of those goods or services. *See J & J Snack I*, 149 F.Supp.2d at 144 (citing *Commerce Nat'l*, 214 F.3d at 437). Here, J & J has shown that it owns the mark, but has not shown that the mark is valid and legally protectable. As a result, this Court does not need to address whether Earthgrain's use of the mark is likely to create confusion because Plaintiff can not succeed on its claim regardless.

Still, this Court discussed at length the likelihood of confusion factor in its decision in *J & J Snack I*, 149 F.Supp.2d at 154–157. There, this Court found that J & J had not shown a likelihood of confusion or of reverse confusion. *Id.* at 155, 157. To date, J & J has not submitted any additional evidence to show confusion or reverse confusion. It still sells to only the limited market of fundraiser distributers, while Earthgrains still does not aggressively advertise its product. Without mass marketing or consumer overlap, this Court again finds that the likelihood of confusion or reverse confusion between Earthgrains' and J & J's marks is "nil." *See J & J Snack I*, 149 F.Supp.2d at 157.

Therefore, viewing the evidence in the light most favorable to Plaintiff J & J, this Court must find that Earthgrains has shown that the evidence leaves no genuine issue of material fact regarding the federal trademark infringement claim under § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), and the federal unfair competition claim under 43(a) of the Lanham Act,

---

18. Plaintiff did submit the expert report of John A. Bunge, who critiqued Mr. McCullough's survey, at the Preliminary Injunction stage of this case. (Scaramella Decl., Ex. 12.) At that time, this Court found that the McCullough survey remained reliable. *J & J Snack I*, 149 F.Supp.2d at 153. This finding has not changed.

15 U.S.C. 1125(a). Therefore, this Court will grant Defendant's motion for summary judgment on these claims.

### 2. *Remaining statutory and common law claims*

The parties agreed at the Preliminary Injunction stage of this proceeding that the elements required to prevail on the remaining claims for common law trademark infringement and unfair competition (Counts III and IV) and for New Jersey statutory unfair competition (Count V) are identical to the elements required by federal law under the Lanham Act. *J & J Snack I*, 149 F.Supp.2d at 157. Therefore, because this Court has found that no genuine issue of material fact remains on the federal claims, it similarly must find that no genuine issue of material fact remains on the common law and statutory claims for trademark infringement and unfair competition. As a result, this Court will grant Defendant Earthgrain's motion for summary judgment on these claims as well.

### III. *CONCLUSION*

In conclusion, this Court finds that J & J has not shown any evidence to rebut Earthgrains's showing that there is an absence of evidence supporting the claims of trademark infringement and unfair competition. Plaintiff's assertions that the "BREAK & BAKE" mark is protectable are a mere scintilla, and are not sufficiently probative to defeat Defendant's showing that no genuine issue exists. This Court holds that J & J's mark, "BREAK & BAKE," is descriptive without secondary meaning, and is therefore not protectable. Summary judgment in favor of Earthgrains will be granted and Plaintiff's Complaint will be dismissed.

Therefore, for the reasons discussed herein, and because no genuine issues of material fact remain in dispute in this case, Defendant Earthgrains' motion for summary judgment will be granted. Plaintiff J & J's Complaint against Defendant Earthgrains will be dismissed with prejudice.

The accompanying Order is entered.

### ORDER

This matter having come before the Court upon the motion of Defendant Earthgrains Co. ("Earthgrains") for summary judgment on the claims contained in the Complaint of Plaintiff J & J Snack Foods, Corp., pursuant to Rule 56, Fed., R. Civ. P. [Docket Item 24–1]; and the Court having considered the parties' written submissions as well as oral arguments made on May 2, 2002; and for the reasons expressed in Opinion of today's date;

**IT IS** this _____ day of September, 2002, hereby

**ORDERED** that Defendant Earthgrains' motion for summary judgment on Plaintiff J & J's Complaint [Docket Item 24–1] be, and hereby is, *GRANTED;* and

**IT IS FURTHER ORDERED** that Plaintiff's Complaint be, and hereby is, *DISMISSED WITH PREJUDICE.*